9 So.2d 485

**ROPER v. BROOKS.**

No. 36588.

June 29, 1942.

R. D. Watkins, of Minden, for applicant.

A. S. Drew, of Minden, for respondent.

HIGGINS, Justice.

We granted a writ of certiorari in this case, directed to the Court of Appeal of the Second Circuit, to review its opinion and decree annulling the judgment of the Twenty-sixth Judicial District Court for the Parish of Webster, in favor of the plaintiff and against the defendant, and rendering judgment in reconvention against the plaintiff.

This is an ex delicto action to recover damages for personal injuries and property loss alleged to have been sustained by the plaintiff as a result of the defendant's truck colliding with her Chevrolet automobile in which she was riding on U. S. Highway No. 80, eight miles west of the City

of Minden, in Webster Parish, La. The defendant, who is a nonresident, had not appointed an agent in this State upon whom service of process might be made, and the plaintiff had service made upon him in accordance with the provisions of Act 86 of 1928, as amended by Act 184 of 1932, by citing the defendant through the Secretary of State, in order that she might obtain a judgment in personam. In connection with her suit, the plaintiff also prayed for a writ of attachment against the defendant on the ground of nonresidence, pursuant to the provisions of Act 215 of 1920 and Act 220 of 1932, and, under the writ, caused to be seized certain movable property belonging to the defendant, located in Webster Parish.

Through appropriate proceedings, the defendant was granted an order to bond the seizure and thereby had his property (trucks) released. He then moved to dissolve the writ of attachment on the ground that, as the plaintiff had availed herself of Act 86 of 1928, as amended by Act 184 of 1932, she had accepted the Secretary of State as the duly appointed agent of the defendant, and having thus cited him, the court obtained personal jurisdiction over the defendant and, therefore, the plaintiff had deprived herself of the right of attachment on the ground of nonresidence. He also alleged that the writ was illegally issued in contravention of the express provisions of Section 1 of Act 220 of 1932. He pleaded that the issuance of the writ of attachment was in violation of his constitutional rights guaranteed by Section 1

of the XIV amendment and Section 2 of Article IV of the Federal Constitution.

The district judge overruled the motion to dissolve, which was tried on the face of the record with an agreed stipulation listing the items of damage sustained by the defendant, as a result of the alleged illegal issuance of the writ and the seizure thereunder.

The trial judge refused to grant the defendant a suspensive appeal to the Court of Appeal, and his application to this Court for writs of certiorari, prohibition, and mandamus, directed to the district judge, were refused, for the reason that the Court of Appeal would have the right to act in aid of its appellate jurisdiction.

The case was then tried on its merits and the learned district judge entered judgment in favor of the plaintiff and against the defendant for the sum of $1,146, covering damages for personal injuries and property loss, with recognition of the plaintiff's rights under the writ of attachment.

The Court of Appeal of the Second Circuit, after hearing the case on a suspensive appeal taken by the defendant, annulled the judgment on the merits and awarded the defendant the sum of $490, as damages, for the illegal issuance of the writ of attachment. 9 So.2d 497.

A rehearing was granted on the plaintiff's application and, by a divided court of two to one, an opinion was rendered holding that the writ of attachment was illegally issued, and reinstating the orig-

inal judgment of the court. 9 So.2d 497.

Section 1 of Act 184 of 1932, amending and re-enacting Section 1 of Act 86 of 1928, reads as follows:

"Be it enacted by the Legislature of Louisiana, That the acceptance by non-residents of the rights and privileges conferred by existing laws to operate motor vehicles on the public highways of the State of Louisiana, or the operation by a non-resident or his authorized employee of a motor vehicle on the said highways other than under said laws, shall be deemed equivalent to an appointment by such non-resident of the Secretary of the State of Louisiana or his successor in office, to be his true and lawful attorney for service of process, upon whom may be served all lawful process in any action or proceeding against said non-resident growing out of any accident or collision in which said non-resident may be involved while operating a motor vehicle on such highways, or while same is operated by his authorized employee; and said acceptance or operation of said vehicle shall be a signification of his agreement that any such process against him which is so served shall be of the same legal force and validity as if served on him personally."

Sections 2 and 3 of Act 86 of 1928 provide:

"Section 2. The service of such process shall be made by serving a copy of the petition and citation on the Secretary of State, or his successor in office, and such service shall be sufficient service upon said non-resident; provided that notice of such service, together with a copy of the petition and citation are forthwith sent by registered mail by the plaintiff to the defendant, or are actually delivered to the said defendant, and defendant's return receipt, in case notice is sent by registered mail, or affidavit of the party delivering the petition and citation in case notice is made by actual delivery, is filed in the proceedings before judgment can be entered against said non-resident. The Court in which the action is pending may order such continuances as may be necessary to afford the defendant reasonable opportunity to defend the action.

"Section 3. *Be it further enacted that nothing in this Act shall be construed as affecting other methods of process against non-residents as now provided by existing laws."* (Italics ours.)

Act 215 of 1920 provides:

"Section 1. Be it enacted by the General Assembly of the State of Louisiana, That in all suits instituted in any of the courts of this State, in which the demand is for damages arising from an offense, quasi-offense, or tort and where the defendant, whether an individual, partnership (commercial or ordinary) or a corporation, is a non-resident of this State, or not domiciled therein, or, in the case of a corporation, not incorporated, under the laws thereof, the plaintiff shall have the right to sue out a writ of attachment against the property of the defendant, upon making affidavit and giving bond, as now required by law, in suits against non-resident defendants for other causes of action, *provided that the provisions of this*

*act shall not apply in cases where the individual, partnership (commercial or ordinary) or corporation has appointed an agent in the State of Louisiana upon whom service or process may be made."* (Italics ours.)

Act 220 of 1932 reads, as follows:

"Section 1. Be it enacted by the Legislature of Louisiana, That in all suits instituted in any of the courts of this State in which the demand is for a money judgment and the defendant is a non-resident of this State, or when the defendant is not domiciled in this State, whatever may be the nature, character or origin of the plaintiff's claim, the plaintiff shall have the right to sue out a writ of attachment against the defendant's property, whether the claim be for a sum certain or for an uncertain amount, and whether the claim be liquidated or unliquidated, upon making affidavit and giving bond as now required by law in suits against non-resident defendants, *provided that the provisions of this Act shall not apply in cases in which the defendant has a duly appointed agent in the State of Louisiana upon whom service of process may be made."* (Italics ours.)

The plaintiff contends that, under the provisions of the foregoing statutes, as the defendant is a nonresident "who has not duly appointed an agent in this State upon whom service of process may be made", she is entitled to proceed against the defendant, in personam, on her unliquidated claim, and to couple with her suit a writ of attachment and cause to be seized there-

under the nonresident's property located within the jurisdiction of the court.

The defendant argues that since the Secretary of State is designated by the law as the nonresident's true and lawful attorney for service of process as a result of defendant driving his motor vehicle upon the highways of the State, he is in the identical position as a nonresident, who has duly appointed an agent upon whom service of process might be made, and therefore, under the express provisions of Act 220 of 1932, the plaintiff was not entitled to have a writ of attachment issue; that plaintiff having elected to proceed in personam against the defendant and the court having obtained personal jurisdiction over him, she was without any legal right to attach the defendant's property as a nonresident, and to construe the acts of the Legislature to the contrary would render them unconstitutional by making them discriminatory, in denying the defendant, a nonresident, the equal protection of the law.

It is clear that the purpose of Act 86 of 1928, as amended by Act 184 of 1932, is to place nonresident operators of motor vehicles, using the highways of this State, under the same obligations, duties and responsibilities as resident operators by requiring nonresident operators to answer for their acts in this State, if any cause of action arises against them therefrom, and to provide claimants in tort actions growing out of the negligent or careless operation of motor vehicles by a nonresident or his employeee an effective means of judicially enforcing their claims. Galloway v. Wyatt

Metal & Boiler Works, 189 La. 837, 181 So. 187.

■ The courts have upheld the constitutionality of statutes of this type because such enactments are a valid exercise of the police power. Maddry v. Moore Bros. Lumber Co., 195 La. 979, 197 So. 651; Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091.

Section 3 of Act 86 of 1928 expressly declares that nothing therein contained "shall be construed as affecting other methods of process against non-residents as now provided by existing laws."

■ Under the specific provisions of Act 215 of 1920 and Act 220 of 1932, the property of a nonresident defendant may be attached in a tort action or for an unliquidated claim, upon the plaintiff making an affidavit and furnishing bond as required by law. This Court has held that in applying the provisions of Act 215 of 1920 and Act 220 of 1932, it makes no difference if both the plaintiff and the defendant in the proceedings are nonresidents of Louisiana (Jackson State Nat. Bank of Jackson, Miss. v. Merchants' Bank & Trust Co. of Jackson, Miss., 177 La. 975, 149 So. 539), thus showing that the benefits of the statute have not been confined to residents of this State.

■ The point made by the defendant that the provisions of Act 215 of 1920 and Act 220 of 1932 are inapplicable to him because the Secretary of State is made his agent for service of process by Act 86 of 1928, as amended by Act 184 of 1932, is without merit. The provisos in the last

part of Act 215 of 1920 and Act 220 of 1932 clearly have reference to those nonresident parties who previously complied with our statutes by appointing their own agents for service of process. For instance, in the case of Burgin Bros. & McCane v. Barker Baking Co., 152 La. 1075, 95 So. 227, the Court pointed out that, as the nonresident corporation had complied with the provisions of Section 23 of Act 267 of 1914, as amended by Act 120 of 1920, by appointing a resident agent for service of process, and thereby acquired, under the terms of the statute, the rights and privileges accorded a domestic corporation, the nonresident corporation was not subject to the writ of attachment. See, also, McGovern v. United Railway Men's Oil Ass'n, 157 La. 966, 103 So. 280, and Fullilove v. Central State Bank, 160 La. 831, 107 So. 590.

It will be noted that in none of the statutes in question is it provided that, since the Secretary of State is designated as the agent of the nonresident upon whom service of process can be made, the nonresident motorist, who used the highways of this State, was thereby to be placed on the same legal basis as those who named their own particular agents for the service of process. The Court observed in the Burgin Bros. & McCane v. Barker Baking Co. case, supra, that Act 267 of 1914, as amended by Act 120 of 1920, granted the nonresident corporation, complying with its provisions, equal rights, as to attachments, with domestic corporations. This indicates that the Legislature, in designating the Secretary of State as the agent

of the nonresident upon whom process might be served, did not intend to deprive the plaintiff of any other legal right that he might have under other laws to attach a nonresident's property. This is made clear by the provisions of Section 3 of Act 86 of 1928, whereby the rights of a litigant against a nonresident under existing laws are expressly declared not to be affected.

By the very terms of Act 86 of 1928, as amended by Act 184 of 1932, the Secretary of State is made the agent of the nonresident solely and only for the purpose of service of process for a particular claim growing out of an accident or collision while a nonresident or his authorized agent operates a motor vehicle on the highways of this State. Clearly, the Secretary of State is not made the general agent of the nonresident for service of process in other kinds or classes of claims. This is quite different from a case where a nonresident names his own agent upon whom service of process for all types of claims may be made. All that the Legislature meant by placing the provisos in the statutes in question was that, if the nonresident had already appointed his own agent upon whom service of process could be made, the provisions of Act 215 of 1920 and Act 220 of 1932 would not be applicable. This is quite different from the Legislature stating that where a nonresident failed to name an agent upon whom process could be made, the Secretary of State would be legally considered his agent for service of process, with the same general legal effects as if the nonresident had named and appointed his own agent for service of process.

The law has been well established for many years that a resident of this State has the right to sue a nonresident on any cause of action, and, if personal service of citation can be obtained on the nonresident anywhere in the State, the resident can secure a personal judgment against him under Article 165, subdivision 5 of the Code of Practice. Gamburg v. Ray, 167 La. 865, 120 So. 480.

The grounds upon which a writ of attachment may issue are set forth in Article 240 of the Code of Practice. The second one given is "When such debtor resides out of the State."

Prior to the enactment of Act 215 of 1920 and Act 220 of 1932, a writ of attachment could not be issued upon an unliquidated claim for damages. Under the provisions of Act 86 of 1928, as amended by Act 184 of 1932, the plaintiff asserting an unliquidated claim, resulting from a tort committed by a nonresident operator of a vehicle on the public highways of this State, and who has not appointed an agent for service of process, has a right to cite the nonresident through the Secretary of State, and such service shall have the same legal force and validity as if the citation had been served on the defendant personally. Therefore, under the present law, as under the prior law and jurisprudence, the personal service of the citation upon the defendant does not deprive the plaintiff of the right to attach the nonresident's property located within the jurisdiction of the court. The statutes in question, in making the service upon the Secretary of State equivalent, in legal contemplation, to personal service on the nonresident, do

not expressly or impliedly repeal the claimant's right under existing laws to an attachment against the nonresident. If the jurisdiction over the defendant, in personam, as distinguished·from in rem, deprives the plaintiff of the right to a writ of attachment against a nonresident under other laws, the nonresident or absentee could dissolve the attachment against his property by making a personal appearance in the case as soon as he is notified. Poulan v. Gallagher, La.App., 2nd Cir., 147 So. 723, at page 724, and authorities therein cited; Gamburg v. Ray, supra.

It is our opinion that the motion to dissolve the attachment is without merit and was properly overruled by the district judge.

Counsel for the defendant, in presenting his argument that the statutes are unconstitutional—on the ground that they are discriminatory and deny the defendant the equal protection of the law if the Court construes the statutes so as not to require the plaintiff to elect between proceeding in rem by attachment or in personam, by service of process through the Secretary of State, and thereby allows her to proceed under both processes—relies upon the case of State of Wisconsin ex rel. A. C. Cronkhite v. E. B. Belden, Circuit Judge, 193 Wis. 145, 211 N.W. 916, 917, 214 N.W. 460, 57 A.L.R. 1218.

The statutes of Wisconsin are similar to our own relative to the appointment of the Secretary of State as the agent for service of process against nonresident motorists. The statute contains a provision that continuance in any case arising out of the use by nonresident vehicle operators of the State highways should be limited to ninety days and does not contain any such provision as to resident litigants. The Supreme Court of Wisconsin, in sustaining a plea of unconstitutionality, stated:

"It seems quite clear that the provision of the statute limiting continuance to 90 days cannot stand. It is discriminatory and denies to nonresidents rights and privileges enjoyed by *residents under the same or similar circumstances upon no other ground than that they are nonresidents.* The courts of Wisconsin having once obtained jurisdiction of the person of a nonresident defendant, *we perceive no reason why his right to a continuance should rest upon different grounds than the rights of residents.* It must be held invalid." (Italics ours.)

It will be noted that the court was unable to assign any reason for making a distinction between nonresidents and residents in the granting of a continuance in such cases. There could be no reason why a nonresident personally subject to the jurisdiction of the court should be denied equal rights with a resident relative to continuances.

 Substantial reasons for making a difference between nonresidents over whom the court has obtained jurisdiction of the person, and residents of the State who have been personally served with citation, and against whom personal judgments have been obtained, can be assigned with reference to the execution of such judgments: In the case of the resident against whom a final personal judgment

has been rendered, his property is immediately subject to seizure and sale under process of the law. If he attempts to evade the judgment by making simulated sales or mortgages, they are subject to an annulment action. If the resident judgment debtor is without assets at the time he is cast, the recordation of the judgment in the mortgage office operates as a legal mortgage against any property that he might thereafter acquire for a period of ten years, and may be renewed for an additional ten years, at the expiration of that time. The same observations may be made with reference to a nonresident or a foreign corporation, which has qualified to do business in this State and has appointed an agent upon whom service of process could be made. The nonresident against whom a final personal judgment has been obtained is in a different position when it comes to the execution of the judgment against him. If he has any property in the State, as soon as he is notified of the suit, he could either sell the property or remove it from the State and place it beyond the reach of his judgment creditors, unless the claimant seizes the property under a writ of attachment, coupled with his suit. Even though the judgments of courts of record of the various states of the Union are entitled to full faith and credit in other jurisdictions, certain proceedings are necessary to have the courts of the other states recognize the judgments before they can be executed, under the laws of that state. Before the judgment can be recognized the nonresident judgment debtor again could evade the judgment by concealing, removing, or disposing of his property.

The burden on a judgment creditor to locate seizable assets of his nonresident judgment debtor is certainly greater than upon the judgment creditor who has a personal judgment against a resident. Then, again, the laws of the state of the nonresident exempting property from seizure may be more liberal than the laws of this State. The problem of collecting a judgment against a nonresident debtor is certainly more involved and complicated than the execution of a personal judgment against a resident of the State. It is needless to say, a judgment is practically worthless unless it can be collected.

The above observations show that substantial reasons can be given why, in the case of a nonresident, who is served in person, or served through the Secretary of State, in such a way as to amount to a personal service, he should be subject to having property located in this State attached in connection with the plaintiff's claim, whereas if he were a resident of the State upon whom personal service had been obtained, his property should not be subject to seizure under a writ of attachment. It must be borne in mind that the plaintiff who causes a writ of attachment to issue must make proper affidavit and furnish adequate bond to secure the rights of the defendant in the event the attachment was illegally issued.

It is our view that the above cited authority is not apposite and that the defendant's plea of unconstitutionality of the statutes is unfounded.

The defendant objects to the Court considering the case on the merits as insisted

upon by the plaintiff, contending that as the rehearing was limited to a consideration of the legality vel non of the writ of attachment and the items of recoverable damages for its illegal issuance, those are the only questions before us. The opinion of the court on rehearing does state that it was limited to a consideration of the motion to dissolve the attachment but in the last paragraph thereof, the court states that the original judgment was reinstated.

 The record shows that the plaintiff applied for a rehearing from the original decree annulling the judgment of the district court and deciding the issues adverse to the plaintiff, first, on the ground that the judgment of the court in reversing the district court judgment was erroneous and contrary to the law and the evidence, and, second, that the judgment of the court in awarding defendant damages against the plaintiff for the illegal issuance of the writ of seizure was likewise erroneous and contrary to the law and that the plaintiff was entitled to a rehearing. The original opinion was rendered on April 1, 1941, an application for a rehearing was filed on April 17, 1941, and a rehearing was granted on June 18, 1941, but nothing is said about restricting the rehearing to a consideration of the motion to dissolve the writ of attachment. Even if the rehearing were limited as to the issues with reference to the attachment, when this Court grants a writ of review directed to the Court of Appeal, the law vests us with the authority to consider and the duty to decide both questions of fact as well as questions of law. Section 2, Act 191 of 1898; Article VII, § 11 of the Constitution of 1921, and

Robichaux v. Realty Operators, 195 La. 70, 196 So. 23.

On the merits, the issues of fact involved were whether or not the truck was being operated at an excessive rate of speed on the left or wrong side of the road, without the driver keeping a proper lookout, and running into the plaintiff's car while it was on its extreme right hand side of the road, going in the opposite direction.

On November 1, 1937, about 1:30 a. m., the plaintiff's two-door Chevrolet sedan was being driven by a young man, Lee D. Howell, Jr., in the direction of Minden, on U. S. Highway No. 80, eight miles west of Minden, La. Two couples occupied the front seat of the car and no one was seated in the rear. Leroy Crane, an employee of the defendant, was driving the defendant's 1937 Chevrolet double wheel truck, with a 4,000 pound trailer mounted on it on the same highway, in the direction of Shreveport, or in the opposite direction from which the automobile was travelling. In other words, the car was proceeding in an eastwardly direction and the truck was going in a westwardly direction. The vehicles were on a highway, paved with an eighteen foot concrete strip, with a black line down the center, and there was a dirt shoulder, a few feet wide on each side, covered with grass. At the point where the accident happened, there was a broad curve in the road with a guard rail on the shoulder on the southside or side of the road which was occupied by the car. The truck and the car collided in the curve with the result that Howell (the driver of plaintiff's car) was so badly injured, he died before he reached the hos-

pital. The two young ladies, one of whom was the plaintiff, were injured, but the young man, Solon Keith, who was sitting on the extreme right hand side of the car, was not hurt. As a result of the impact, the entire left side of plaintiff's automobile was badly wrecked and it turned over in the roadway on its left side towards the right side of the center line of the road and at practically the point where the collision occurred. The truck continued forward in a zigzag course on the highway about three hundred feet from the point of contact in the direction of Shreveport before coming to rest on the south side or its left side of the highway in a ditch.

The plaintiff and her young lady companion, Helen Irby (now Mrs. Streetman) testified that the couples were returning home in the plaintiff's car from the Shreveport Fair, where she and Miss Irby had, earlier in the evening, drunk two bottles of beer; that later, across the river from Shreveport at Bossier City, on their way back, they had eaten sandwiches; that the men had not drunk any intoxicating liquor; that young Howell had a good voice and as they rode along, they joined him in singing; that as they approached the curve where the accident happened, a truck running at a very rapid rate of speed passed them; that the defendant's truck, which followed at a short distance behind the first one, was running about fifty miles an hour; that they observed the truck was on its left or the wrong side of the road and warned Howell to pull over to his extreme right hand side of the road; that after having slowed the car down to a speed of approxi-

mately twenty-five miles per hour, Howell drove the car as far to his right as possible on the shoulder of the road against the guard rail; that while in that position and almost at a standstill, the left side of the truck crashed into the left side of the car, striking it with such force as to practically tear away its entire left side, knocking it into the guard rail and causing it to turn over on its left side, to the right side of the middle of the road going in the direction of Minden; that the truck continued on down the road in the direction of Shreveport for a considerable distance and ran into the ditch; that they were assisted from the car by another motorist and brought to the hospital; and that Howell succumbed before he arrived and Miss Irby and plaintiff received medical attention at the institution.

The version of the accident, as related by these two eyewitnesses, was corroborated by the testimony of the father of the deceased, Lee D. Howell, Jr., who went to the scene of the collision with L. H. Harris, who was in charge of the wrecker, and Dr. S. E. Richerson, the Coroner of Webster Parish. They testified that immediately after they were notified, they went to the scene of the accident and upon arriving there, they found the Chevrolet car on its right hand side of the road and physical marks in the pavement caused by the driving shaft of the truck breaking loose and chipping pieces of the concrete out of the road about two feet to the right of the middle line of the road or on the side occupied by the car; that these marks continued in a zigzag course down the road about 174 feet and from that point the shaft tore up the earth

for a further distance of about 81 feet, until the truck came to rest on the south side or its left side of the highway in the ditch; that the left side of the Chevrolet car from the front to the back was practically demolished; and that the left side of the truck commencing at the left front fender and continuing along that side to the rear was damaged as if it had side-swiped something.

Leroy Crane, who was the driver of the defendant's truck, was alone at the time, and he stated that he was running about thirty miles an hour, having left Eldorado, Arkansas, around 8 or 8:30 o'clock the evening before; that he was travelling on his right hand side of the road; that as he approached the Chevrolet car, it pulled to its extreme right on the shoulder of the road and then sharply and suddenly cut back in, towards his truck, apparently due to the fact that the shoulder of the road was lower than the concrete strip; that the Chevrolet car struck the left rear wheel of his truck dislodging and damaging the spring, the driving shaft and the hydraulic brakes by the impact; and that the truck continued on down the road out of control nearly 300 feet until it came to rest in the ditch.

Fred Elledge, the driver of the defendant's second truck, which was following the one involved in the accident, stated that he did not see the collision due to the fact that he was some distance away, and because it occurred in the curve of the road; that they were running 35 miles per hour; that he examined the road and found chip marks in the concrete on the truck's right side of the black middle line; and that he assisted the injured people out of the automobile and into a Ford car, which took them away for medical attention.

C. D. Martindale, defendant's employee, Rubin Brooks, the defendant's son, Ben Achee, the insurance adjuster, and Foster Campbell, a business associate, and the defendant, all testified that they went to the scene of the accident early the next morning after the automobile had been removed and that the truck was still in the ditch; that the marks on the pavement caused by the driving shaft were on the truck's right hand side of the black line in the middle of the road some several inches; and that the blow caused the truck to get out of control and disrupted its brake facilities and that it continued down the road a considerable distance to the point where it ran into the ditch.

The defendant introduced in evidence three photographs of the Chevrolet car, which show clearly that the right front and right rear fenders had been damaged by coming in contact with something on the right hand side of the car; that grass and dirt were found on the tires on the right wheels of the car; that the entire left side of the car from front to back was terribly damaged, the door being completely torn away and the left front wheel, the fender, and the left side of the car being practically demolished; that the front bumper was not damaged; and that the radiator grill, the two headlights and the left half of the hood of the car were not damaged. It clearly appears that some part of the truck struck the left front side of the Chevrolet car between the left head-

light and the left front part of the bumper, completely tearing the fender from the bolts that connected it to the metal part by the radiator and headlight, tearing and demolishing it into a twisted mass, knocking the left front wheel with its accessories—the shock absorber, steering apparatus, etc.—completely from their fastenings and jamming it against the left front body and chassis of the car, tearing away the left door and door posts and the left rear side, window and fender of the car from their regular position and pushing them back and also damaging the left side of the front seat.

Although the defendant had the truck in his possession, he apparently did not make any photographs of it showing the extent and location of the damage to it, and if he did make such photographs, he did not introduce them in evidence.

The Court of Appeal was impressed with the explanation of Leroy Crane that the left front part of the bumper was not damaged because when the car turned sharply from the shoulder of the road towards the left and into the left rear wheel of his truck, the tire on the left front wheel of the car protruded a little beyond the bumper and, therefore, the left rear wheel of the truck struck the left front wheel of the Chevrolet car without damaging the bumper. If the left front wheel of the car had been turned sufficiently to its left to cause it to protrude beyond the left front bumper, the automobile would necessarily have, as Crane stated it did, cut sharply into the side of his truck. Under these circumstances, it would have been impossible for the left rear tire of the truck to have completely crumpled and destroyed the left front fender of the car without damaging the bumper, as shown by the photographs. Furthermore, if the left front tire of the car came in contact with the left rear tire of the truck, as both vehicles were going in opposite directions, the weight and momentum of the truck would have drawn the front part of the car into the side of the truck and swung the left side of the car away from it. But this did not happen.

The photographs also show that the left running board of the car was damaged only where the left front and left rear fenders joined it. If all of the damage to the Chevrolet car had been done by the left rear double wheel of the truck, the running board would have been directly in its path and, yet, it was not damaged except as above indicated.

These photographs corroborate the testimony of the plaintiff and her witnesses that the truck was not only damaged on the left rear wheel and fender, but that the left front fender and side of the truck were damaged as if the truck had sideswiped something. These photographs also show that whatever part of the truck came in contact with the Chevrolet car was elevated to a point above the height of the left front bumper and left running board but below the left front headlight, the glass of which was not even cracked.

With reference to the speed at which the truck was travelling, Crane stated he was going about 30 miles an hour and Elledge testified that they were running about 35

miles an hour. The plaintiff and Miss Irby stated that the truck was going approximately 50 miles an hour.

■ The evidence leaves no doubt that the truck proceeded down the highway with one of its tires blown out and the driving shaft dislodged and stabbing into the road, and that it continued on down the road for about 300 feet from the point of contact, after having practically demolished the entire left hand side of the car and causing it to turn over. If the truck had been running about 30 to 35 miles an hour, we are quite certain that it would have stopped much sooner than it did—all of which clearly shows that the plaintiff and Helen Irby Streetman were corroborated in their statements that the truck was travelling at a very rapid rate of speed or about 50 miles per hour.

■ Elledge stated that the two trucks left Eldorado about 11 o'clock p.m. Crane stated that the two drivers had stopped the trucks twice for a period of about 20 or 30 minutes for the purpose of getting coffee and something to eat. The accident happened about 1:30 o'clock a.m. The defendant stated that it was about 80 miles from Eldorado, Arkansas, to Minden, Louisiana. The accident happened 8 miles west of Minden and, therefore, deducting one-half hour for the time that the two drivers ate sandwiches and drank coffee, leaves a period of 2 hours in which the two trucks covered the distance of practically 80 miles. Of course, Crane's statement that the trucks left Eldorado at 8 or 8:30 o'clock in the evening and the only two stops made were for refreshments and that the trucks

were running 30 miles an hour, makes his calculation of time and speed unacceptable, because the trucks would have been on the road 5 hours.

The defendant attempted to show that these two couples were on a wild party or joy-ride in an intoxicated condition, and produced as his last witness, E. Newberry, a Deputy Sheriff of Webster Parish, who testified that around 8 o'clock in the evening preceding the accident, he saw the plaintiff and Solon Keith of Arkansas at a barbecue stand eating a sandwich; that there was a pint bottle containing some whiskey sitting on the table and that Keith invited him to have a drink, but he declined. On cross-examination, he was asked: "You didn't see her (plaintiff) take a drink of whiskey?" A. "No, sir." "Q. Did you see Keith take a drink of whiskey?" A. "No."

■ The mere fact that the two young women admitted on the stand that they had each had two bottles of beer between 9:30 and 12 o'clock p.m., while at the Shreveport Fair, is certainly insufficient to justify the conclusion that they were intoxicated. Moreover, the evidence shows that the two young men had not been drinking. The mere fact that these young people were singing in the car going to and returning from the Fair does not prove that they were under the influence of liquor.

If these couples had been drinking intemperately, the medical reports on the two young ladies who had been taken to the sanitarium, and the report of the coroner, who had taken charge of the body of young Howell, would have shown,

beyond any doubt, whether they were intoxicated. No such proof was offered.

The defendant also sought to discredit the plaintiff's testimony by showing that she was a young married woman, who had been separated from her husband, and that she had gone out with Solon Keith, a married man. The evidence is uncontradicted that Keith was a friend of the plaintiff's brother and that she had gone in her automobile to get Keith at his home, upon the instructions of her brother who had been, unexpectedly, detained at work and was unable to keep the engagement. It also appears that the plaintiff and Mr. and Mrs. Keith were friends and that they visited each other.

Keith appeared at the courthouse on two occasions when the case had been set for trial but continued, and the third time, when the case was actually tried, in spite of the plaintiff's and her attorney's best efforts to secure Keith's presence, he failed to appear in court. He was a resident of the State of Arkansas, where the defendant also resided, and the testimony shows that Keith and the defendant had communicated with each other about employing Keith's son. The plaintiff assigns this as the reason why Keith refused to testify, although he had previously appeared and testified before the Coroner's jury in connection with the investigation of the death of young Howell, when Leroy Crane was arrested.

The four young people, by sitting on the front seat of the car, were thereby failing to exercise prudence and care, as the crowded condition might have interfered with the proper operation of the car. But the evidence leaves no doubt in our mind that the four people sitting on the front seat of the car was neither a proximate nor a contributory cause of the accident. The defendant's own witnesses testified that they saw the tire marks on the shoulder of the side of the road occupied by the Chevrolet car and the damage caused to the guard rail by the car scraping against it, as well as the broken part thereof, which came in contact with the right side of the Chevrolet car.

It is fortunate that none of the young people occupied the left rear seat of the car, because if any of them had been sitting there, the photograph conclusively shows that it would have been a miracle if they had not met with the same fate as young Howell.

All of the plaintiff's evidence shows that the accident happened on the Chevrolet's side of the road. Therefore, the sole and proximate cause of the collision was the failure of the driver of the truck to remain on his right hand side of the road and to slow down in rounding the curve. This was the view of the trial judge, who heard and saw the witnesses, and his opinion that there was liability on the part of the defendant was well supported by the evidence.

The district judge awarded the plaintiff $1,146 covering damages for personal injuries and property loss. The evidence shows that she sustained a tearing cut on the lower lip necessitating four stitches; and that she received a hard blow to her chest and hip causing severe bruises. The

X-ray pictures failed to reveal any fractures. She remained in the hospital about 12 days and suffered pains in her back, which required her to be strapped several times since the accident. The scar is not noticeable and the injuries are not permanent.

The defendant objected to the introduction of the medical bill of $75 and the hospital bill of $71 on the ground that the plaintiff was a married woman and her husband was liable for these expenses, as the head and master of the community and he alone could sue to recover them. The evidence shows that the plaintiff had been separated from her husband for more than four months prior to the accident and that she personally obligated herself to pay the bills. She has never become reconciled with him since then. The trial judge overruled the objection and we think, under the circumstances, the ruling was correct. Act 132 of 1926 and Act 283 of 1928.

It appears that the Chevrolet car was practically new and it cost $900, plaintiff's brother having traded in her Dodge car on account thereof. The wrecked Chevrolet car was worth about $200 and this left plaintiff with a loss of $700. From what we have said, it is apparent that the trial judge awarded the plaintiff very modest damages. As plaintiff did not answer the appeal and ask that the amount be increased in the Court of Appeal and does not complain here as to the award, we shall not disturb it.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment

of the Court of Appeal is annulled and set aside, and the judgment of the district court in favor of the plaintiff and against the defendant is affirmed at the defendant's costs.