169 So.2d 695 (1964)
Lucien V. PLAISANCE et ux.
v.
MARYLAND CASUALTY COMPANY et al.
No. 6192.
Court of Appeal of Louisiana, First Circuit.
November 16, 1964.
Rehearing Denied December 21, 1964.
*697 Sessions, Fishman, Rosenson & Snallings, Loeb & Livaudais, New Orleans, for appellants.
Stanley L. Perry, Galliano, for appellees.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This is an action in tort wherein plaintiffs, Mr. and Mrs. Lucien V. Plaisance, seek damages for personal injuries sustained by Mrs. Plaisance, medical expense incurred by Mr. Plaisanse in the treatment of his wife's injuries and property damage to the family automobile as a result of an accident in which plaintiff's vehicle, a 1957 Pontiac Sedan, being driven by Mrs. Plaisance, was struck from the rear by a 1959 Oldsmobile owned and operated by Freddie O. Guidry, insured of defendant, Maryland Casualty Company. Also named defendant is American Casualty Company, whose insured, Forrest Adams, allegedly contributed to the accident by suddenly executing a left turn in front of the Plaisance vehicle thus precipitating an emergency requiring Mrs. Plaisance to make a sudden stop, it being conceded, however, Adams' vehicle did not collide with either the Plaisance or Guidry automobiles. The trial court rendered judgment in favor of plaintiff, Lucien V. Plaisance, in the aggregate of $1,972.21, and on behalf of Mrs. Plaisance in the sum of $9,000.00 against defendants, Maryland Casualty Company and American Casualty Company, in solido. From said adverse determination defendants, Maryland Casualty Company (sometimes hereinafter referred to as "Maryland") and American Casualty Company (sometimes subsequently referred to herein as "American") have appealed.
The accident in question occurred at 6:30 P.M., November 9, 1961, on Highway 1, in LaRose, Lafourche Parish. At the time of the accident it was dark, all vehicles involved had their headlights burning, the weather was fair and the roadway, a northsouth concrete, two-lane highway twenty-two feet in width, was dry. The mishap transpired in the right northbound traffic lane opposite the northern end of the premises of a gas station situated on the east side of the thoroughfare. Mrs. Plaisance, accompanied by her sixteen year old daughter, Diana Clara, was proceeding northerly along the highway in her proper lane of travel at a speed of approximately 30-35 miles per hour (well within the legal limit) and was thusly approaching the Adams vehicle traveling southerly on its correct side of the highway. As Mrs. Plaisance neared the north end of the premises of the LaRose Texaco Service Station situated to Adams' left, Adams turned left across the highway into the path of Mrs. Plaisance's oncoming vehicle. To avoid an accident Mrs. Plaisance stopped suddenly in her proper lane of travel and as she did so her vehicle was struck from the rear by the following Guidry automobile.
The learned trial court held both Adams and Guidry liable on the ground that each was guilty of negligence proximately causing the accident. Adams' negligence was asserted by plaintiffs and found by the trial court to consist of his making a left turn into the path of the oncoming Plaisance vehicle at a time when the approaching cars were so close that such a maneuver was manifestly dangerous. Guidry's negligence was asserted by appellees and adjudged by our esteemed colleague below to consist of his following plaintiff's vehicle too closely, not having his automobile under control and failing to stop and thereby avoid striking a vehicle stationary upon the highway.
On appeal defendant American seeks reversal of the judgment against it on the ground its insured, Adams, was free of *698 negligence in that he turned left into the service station when Mrs. Plaisance's vehicle was at least 200 feet distant, consequently it was safe for him to turn and his action in this regard created no emergency. It is further contended by American that Mrs. Plaisance was negligent in that she stopped unnecessarily, that the left turn of the Adams car in no way endangered Mrs. Plaisance and that her careless stopping was the cause of the accident. Alternatively, Mrs. Plaisance is alleged to have been contributorily negligent in the respects mentioned.
Defendant Maryland denies any negligence on the part of its assured, Guidry, and maintains the accident occurred because of the negligence of Adams and Mrs. Plaisance. On appeal, however, counsel for Maryland assigns as error the failure of the trial court to hold that the emergency created by Adams' sudden left turn created an emergency for Guidry as well as Mrs. Plaisance, therefore, Guidry should be exonerated from liability and American held solely liable herein.
Mrs. Plaisance and her guest-passenger daughter in substance testified Adams made a sudden, unsignalled left turn across the path of the Plaisance vehicle when Adams was so near as to require an emergency stop by the Plaisance car in order to avoid a collision. Both said witnesses stated that Adams was so near when he commenced his turn that the rear end of his vehicle passed within three to four feet of the Plaisance car as Adams' automobile left the highway and entered the north end of the service station premises. That the left turning Adams automobile required plaintiff to stop to avoid an accident is corroborated by Guidry who testified plaintiff missed striking the Adams vehicle by a distance of only 10 to 15 feet. Moreover, Guidry testified that following the accident he went into the service station and asked Adams why he turned directly into the path of the Plaisance vehicle and Adams replied with a shrug of his shoulders.
Adams and his guest passenger, Jesse Bourg, in essence testified Adams was proceeding southerly in his proper lane of travel at a speed of approximately 30-35 miles per hour. When Adams made his left turn the oncoming Plaisance vehicle was an estimated 400-600 feet distant. The left turn by Adams in no way interfered with the progress of plaintiff's automobile and after clearing the highway, Adams pulled up at the center pump of the service station and was in the act of getting out of his car when the collision occurred.
Considering first the alleged negligence of Adams, the law of this state requires that a left turning motorist shall first ascertain that there is no approaching traffic, vehicular or pedestrian, and shall not attempt such maneuver unless the way is clear. LSA-R.S. 32:235(A).
On innumerable occasions the appellate courts of this state have held that a driver making a left turn must first ascertain he may do so safely which means he must first determine that there is no traffic, vehicular or pedestrian, approaching from either direction which will be unduly delayed and such driver shall yield the right of way to such approaching traffic and shall not attempt such a maneuver unless the way is clear. One of the many cases so holding is Washington Fire and Marine Ins. Co. v. Firemen's Ins. Co., 232 La. 379, 94 So.2d 295.
It has also been pronounced on many occasions that a left turn is one of the most dangerous maneuvers a motorist may execute and that in doing so great caution should be exercised. See, for example, Barnes v. Spikes, La.App., 148 So.2d 303, and cases therein cited.
We believe, as did our learned brother below, the evidence preponderates in favor of the conclusion that Adams effected his left turn at a time when the oncoming Plaisance vehicle was so close as to make such a maneuver not only unwise, but also dangerous. There would certainly have *699 been no reason for Mrs. Plaisance to make an emergency stop on the public highway if the left turn by Adams was made when the approaching vehicles were at least 400 feet apart as testified by Adams and Bourg. The versions of the incident related by Mrs. Plaisance, her daughter and defendant Guidry appear most plausible, all testifying in effect that the emergency stop by Mrs. Plaisance narrowly averted a collision between the Adams and Plaisance automobiles.
Accordingly, we conclude our esteemed colleague of the trial court correctly held that Adams' left turn was made at a time when the way was not free and clear of oncoming traffic and therefore amounted to negligence which constituted a proximate cause of the ensuing collision between the Plaisance and Guidry vehicles.
Adjudging now the alleged negligence of Maryland's insured, Guidry, we note the principal contention of Maryland is that if Mrs. Plaisance was confronted with an emergency by the negligent left turning Adams vehicle, Guidry, in turn was faced with an impasse not of his own making consequently he is not held to that degree of care ordinarily required of a motorist and is only liable for failure to exercise such care as would have been exhibited by an ordinarily reasonable and prudent driver under the circumstances. On this premise it is contended Guidry did everything within his power to avoid an accident by applying his brakes but because of the sudden and unexpected stop by Mrs. Plaisance he was nevertheless unable to avoid striking her vehicle.
Guidry's testimony reflects he was traveling approximately 100 feet behind the Plaisance vehicle at a speed estimated at 30-35 miles per hour. He observed Adams' left turn across the path of Mrs. Plaisance's automobile and noted the flash of Mrs. Plaisance's brake lights when he, Guidry, was approximately 35-40 feet to the rear of the former's automobile. When asked if he applied his brakes upon seeing Mrs. Plaisance's brake lights go on, he replied: "Not right off. I had a little time before I could put mine on. I put mine on, but I came into her anyway." Tr. P. 92. When queried further regarding precisely what he did upon seeing the brake lights of the forward car flash their warning signal, he answered: "I put myself in a position to put my brakes on. At that time I didn't know she was dead stopped on the road." Tr. P. 93.
The position herein advocated by esteemed counsel for Maryland in effect maintains that when a forward or lead vehicle is faced with an unexpected crisis created by the negligent action of an oncoming motorist, it ineluctably ensues that a following motorist is likewise confronted with an exigency when the lead driver makes a sudden unsignalled stop to avert the danger posed by the approaching vehicle, consequently the following driver is entitled to the benefit of that well established and recognized rule of law which holds that a motorist faced with a sudden emergency is not held to that degree of care expected of a driver under normal circumstances. We concede the ingenuity of the argument presented but are of the firm opinion it would be most unwise and injudicious to hold as a matter of law that it must inescapably be concluded a following motorist is faced with an emergency in every instance wherein a lead vehicle makes a sudden, unsignalled stop to avoid a peril created by a third or oncoming driver. On the contrary, the existence of an emergency, vel non, we believe is a matter to be determined in the light of the facts and circumstances attending each specific case and more particularly the individual conduct of each motorist contributing to or involved in the accident.
The applicable rule governing the conduct of a following driver is set forth in LSA-R.S. 32:234(A) which provides in substance that a driver shall not follow another vehicle more closely than is reasonable and prudent, having due regard to the *700 speed of such vehicle and the traffic upon and condition of the highway. (This provision, applicable at the time of the accident, is substantially identical to the corresponding provision of the 1962 Highway Regulatory Act, now designated R.S. 32:81, subd. A.)
It is an elementary rule of law that a motorist must have his vehicle under control at all times. This rule is applicable to a motorist trailing or following another, it having been held a motorist proceeding behind another vehicle must have his automobile under control and drive at such speed he can stop in the event of an emergency. Benenate v. Brooks, La.App., 95 So.2d 757.
Whether a following motorist has his vehicle under control is determined by the facts of each case including, inter alia, the locus of the accident, nature, type and condition of the highway or road, congestion, prevailing weather conditions, speed and interval maintained by the trailing motorist.
Regarding interval to be maintained by the trailing driver, we cite with approval the following language appearing in McDaniel v. Capitol Transport Co., La.App., 35 So.2d 38:
"In Hill v. Knight, La.App., 163 So. 727, 728, the following rule of law found in Blashfield's Cyclopedia of Automobile Law, Volume 1, Paragraph 942, was cited with approval.
"`The driver of a car following a few feet behind another, under circumstances such that he should anticipate the possibility of obstruction or trouble of some sort, should have his car under such control or proceed at such a rate of speed that he can stop at once if the car in front stops.
"`The only rule that can govern the interval to be maintained is that of reasonable care under the circumstances. The mere fact that a vehicle is moving in close proximity to a moving vehicle ahead and keeping up with it does not of itself constitute negligence. In determining whether or not a driver was negligent in not maintaining a proper distance between his automobile and the one preceding him, the speed at which he was traveling, the condition of the road, the amount of traffic, the condition of his brakes, and his ability, acting with ordinary care, to stop his car if required to do so by a situation not produced by another's negligence, should be considered.'
"Again in Hill v. Knight, supra, the Court held:
"`We recognize and approve the rule of law that a following driver should drive at such a speed and maintain such an interval that he can avoid collision with the leading car, under circumstances which should reasonably be anticipated by him. We do not think the established facts in the instant case called for any anticipation on the part of plaintiff of the gross negligence of defendant's driver in abruptly stopping his truck, without any signal or conduct suggesting such action or any apparent circumstance calling for it.
"`Conditions in the country differ so greatly from those in a city, and in a city, in different sections and on different occasions, that no hard and fast rule can be laid down. Each case must be decided according to its own peculiar conditions.'"
The Hill case has been cited in numerous opinions including Nomey v. Great American Indemnity Company, La.App., 121 So. 2d 763, wherein we also find the following:
"A restatement of the rule, of which we particularly approve, is found in *701 American Jurisprudence, 5A, Section 204, page 354, and reads as follows:
"`The driver of an automobile is not bound to anticipate negligence on the part of another driver, in the absence of anything to indicate otherwise. The care and diligence of the operator of a motor vehicle is to be measured in view of the assumption that others will not drive in a negligent manner, but this assumption does not apply if one sees, or by the exercise of ordinary care and prudence should see, that some other driver will not obey the law, or is unable to do so.'"
In view of the circumstances attending the case at bar we find there was no duty on the part of Guidry to anticipate a sudden emergency stop by Mrs. Plaisance and that he too was faced with an emergency created by the sudden stop of Mrs. Plaisance to avoid the left turning oncoming driver.
However, Guidry's own testimony reveals he was trailing the Plaisance vehicle at a speed of approximately 30 to 35 miles per hour yet, despite the fact he was approximately 40 feet to the rear of Mrs. Plaisance when her brake light flashed on he did not then elect to apply his brakes or take other precautionary measures because he "had a little time". When he ultimately decided to apply his brakes it was too late to avoid a collision. Notwithstanding his proximity to the lead car while traveling at the speed indicated, upon observing the leading driver apply her brakes he nevertheless chose to merely "put himself in a position to apply his brakes" rather than actually attempt to stop, reduce his speed or take other evasive measures.
Granting that a motorist faced with an emergency not of his own creation is not held to the same degree of care required of a driver under normal circumstances, we nevertheless find Guidry negligent in failing to take any precaution or evasive action whatsoever until the avoidance of the collision was physically impossible. The emergency rule does not absolve him of all duty of care. It is settled law that a motorist confronted with a sudden, unexpected peril need not exercise the wisest judgment or take such action as will necessarily avoid an accident, but is nevertheless bound to exercise that degree of care and caution reasonably to be expected of an ordinarily prudent driver under the same circumstances. Stanford v. Bateman Frozen Foods Company, La.App., 149 So.2d 753; rehearing den. February 22, 1963, cert. den. April 17, 1963; Marier v. State, La. App., 78 So.2d 26; Olivier v. Baldwin, La.App., 48 So.2d 806.
In the case at bar the record discloses Guidry was aware of the danger posed by Adams' left turn across the path of plaintiff's vehicle and was further alerted by the brake signal of Mrs. Plaisance's lead vehicle despite which he chose to continue forward without taking any precautionary measure whatsoever until the very last moment at which time it was admittedly too late for any evasive action upon his part to be successful. Under the circumstances shown, we believe that a reasonably prudent driver would have applied his brakes sooner or slowed the speed of his vehicle or taken some preventive measure upon noting the left turning Adams vehicle and the application of brakes by the lead vehicle. Here the negligence of Guidry consists not in his failure to exercise the wisest or most judicious choice to avoid an accident but rather his failure to make any choice or effort whatsoever while some prospect of avoidance of an accident was yet possible. Having failed in this regard, we believe that he neglected to exercise that degree of care required of a reasonably prudent driver under similar circumstances and in that connection he was guilty of negligence, his dereliction in this respect was a proximate cause of the accident rendering his insurer liable for the injuries thereby resulting.
*702 Contemplating next the awards to plaintiffs which defendants assert to be excessive, we find the sum of $1,972.21 allotted Mr. Plaisance, consisting of medical expense in the aggregate of $1,376.39, travel cost amounting to $200.00 in transporting his wife to New Orleans, Louisiana from Thibodaux, Louisiana for 20 visits to her physician, and automobile damage to the extent of $395.83, is amply justified and established by the record and indeed these items are not seriously contested by defendants.
Appellants earnestly argue, however, that damages awarded for Mrs. Plaisance's personal injuries are excessive and should be reduced from the $9,000.00 allotted below to approximately $5,000.00-$6,000.00.
It is amply established by the record that Mrs. Plaisance sustained multiple injuries in the accident consisting primarily of severe strain of the cervical muscles (whiplash type neck strain) and also severe strain of her lumbosacral muscles with possible rupture of the fourth lumbar disc. Immediately following the accident she did not believe herself seriously injured and drove her automobile to her home. Two days later, however, she commenced experiencing severe pain in her neck and low back whereupon she consulted her family physician, Dr. Gilbert E. Caillouet, who, upon examination detected muscle spasm in both the cervical and lumbar region. X-rays proved negative of fracture and the patient's condition was diagnosed as cervical and lumbar strain. Mrs. Plaisance was hospitalized November 18, 1961, placed in neck traction and discharged November 26, 1961, wearing a cervical collar. The patient remained under Dr. Caillouet's care and treatment consisting of medication in the form of muscle relaxants and sedatives and continuation of the use of a cervical collar which she wore until January 15, 1962. During this entire period her neck and back pain persisted with varying intensity from time to time, the degree thereof being directly related to the extent of her activity. Mrs. Plaisance, 47 years of age, was unable to attend to her regular household duties because of the cervical collar as well as the pain and discomfort she experienced upon exertion, bending and stooping. At times the pain radiated into her left leg down to her ankle.
In January, 1962, Dr. Caillouet concluded he was unable to afford Mrs. Plaisance further relief and because of her persistent complaints of neck, back and leg pain, he recommended she consult an orthopedist.
On February 12, 1962, Mrs. Plaisance sought advice and treatment from Dr. Byron Unkauff, Orthopedist, New Orleans, Louisiana. Predicated upon the history related by Mrs. Plaisance, X-ray examination and personal observation consisting of numerous tests conducted by him personally, Dr. Unkauff concluded plaintiff sustained in the accident injuries amounting to moderately severe strain of the cervical muscles and severe strain of the lumbar muscles with the genuine possibility of a ruptured fourth lumbar disc.
Between the aforesaid date of her first visit and February 2, 1963, Mrs. Plaisance visited Dr. Unkauff 20 times. In the beginning the visits were bi-weekly and subsequently changed to monthly. In this interval Mrs. Plaisance's complaints of pain persisted with some remission of the neck pains but her low back pain continued virtually without let up. At times she was able to do some housework but generally she experienced pain upon physical exertion. She continued the use of muscle relaxants and pain relieving drugs and was still taking such medication at the time of trial in May, 1963. In short, Dr. Unkauff was of the opinion that as of the date of her last examination he believed her cervical strain had completely subsided but that her complaints of low back pain were still justified. Dr. Unkauff further believed that Mrs. Plaisance's back condition was likely to persist and would probably necessitate surgery to *703 relieve what he considered the definite possibility of a ruptured fourth lumbar disc.
Considering the nature, duration and effect of plaintiff's injuries and the prognosis of Dr. Unkauff that her back pain will in all likelihood continue, we believe our esteemed brother below was rather conservative in his award to Mrs. Plaisance for pain and suffering.
Although learned counsel for appellees has in brief and oral argument before this court urged increases in the awards to appellees, no appeals, however, were taken herein on appellees' behalf nor were answers filed to the appeals perfected by appellants. Under such circumstances this court cannot increase the awards made appellees below. LSA-C.C.P. Article 2133; Roper v. Brooks, 201 La. 135, 9 So.2d 485; Delta Equipment & Construction Co. v. Cook, La.App., 142 So.2d 427.
The learned trial court properly limited the liability of Maryland Casualty Company to the coverage stipulated in its policy, namely, $5,000.00 to each person for bodily injury, $2,000.00 medical payments, each person, and $5,000.00 property damage, each accident.
Accordingly, the judgment of the trial court is affirmed at appellants' cost.
Affirmed.
HERGET, Judge (dissenting in part).
In my opinion the sole proximate cause of the damages sustained by Plaintiffs in this suit result from the negligence of Forrest Adams, an approaching motorist, in suddenly executing a left turn into the path of Mrs. Plaisance's vehicle precipitating an emergency requiring a sudden unanticipated stop of her vehicle. As a consequence of Adams' negligence, Mr. Freddy Guidry, (insured by defendant Maryland Casualty Company) the driver following Plaintiffs' vehicle, was afforded no reasonable opportunity to stop his car and collided with the rear of the Plaisance vehicle.
In their conclusion the majority concede Mrs. Plaisance was confronted with an emergency caused by the negligent action of Adams in making a left turn into her path, but they also hold Mr. Guidry negligent in his failing to operate his car so as to avoid striking the Plaisance vehicle. They consequently hold his insurer liable in solido with the insurer of Adams.
It does not ineluctably ensue that when a forward or lead vehicle is faced with an unexpected crisis, created by the negligent action of an oncoming motorist, the following motorist is likewise confronted with an emergency when the lead driver makes a sudden unsignalled stop to avert the danger posed by the approaching vehicle. For, if the driver of the following car was cognizant of or should have timely seen the lead vehicle stop and his position was such that he could, by reasonable action, avoid colliding with the lead vehicle and he fails to take such precaution, then, of course, he is guilty of negligence.
LSA-R.S. 32:81, paragraph A., provides:
"A. The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway."
It will be noted no distance is provided at which a motorist must follow a lead vehicle, but such is governed by what may be determined to be "reasonable and prudent" with due regard for the speed, traffic and conditions of, and on, the highway.
In this particular instance the vehicles were traveling well within the allowable speed limit; the road was dry, it was paved and straight; traffic was not particularly heavy and there was no reason for Mr. Guidry to anticipate any sudden stopping of the Plaisance car. The left turn made by Adams blocking the path of Mrs. Plaisance was sudden and, without question, this created an emergency requiring her to suddenly brake her car and stop to avoid striking the Adams vehicle.
*704 The majority by referring to extracts of Mr. Guidry's testimony have ostensibly concluded he was in a position to act so as to avoid striking the stopped Plaisance vehicle, therefore Guidry was guilty of negligence in the causation of the damage sustained by Plaintiffs. Inasmuch as they have predicated their finding in this respect on the testimony of Mr. Guidry, I quote from the record of Mr. Guidry's testimony all relevant evidence pertinent thereto:

"FREDDIE GUIDRY, called for cross examination, after being duly sworn, testified as follows:
"CROSS EXAMINATION
"MR. PERRY:
"Q Would you please state your full name and address?
"A Freddy Guidry, LaRose, Louisiana.
"Q What is your occupation?
"A Deputy Sheriff.
"Q How long have you been engaged in this work, Mr. Guidry?
"A Sixteen years this next May.
"Q I call your attention to an automobile accident which occurred November 9, 1961 in LaRose, Louisiana. Were you a party in the accident?
"A Yes, sir.
"Q Could you explain briefly how the accident occurred?
"A We was, me and Mrs. Plaisance, Mrs. Plaisance and I was headed North on La 1 at LaRose, and she was about, I would say, about 100 feet in front of me, so they had traffic headed East on La 1 right in front of the LaRose Texaco Station, and all at once this '55 Ford by the name of Forrest Adams made a left turn in front of Mrs. Plaisance, and she applied her brakes, and I came right in the back and hit her.
* * * * * *
"Q You were proceeding North toward LaRose, is that correct, and you were following Mrs. Plaisance?
"A Yes.
"Q. How far away from Mrs. Plaisance were you?
"A Whenever she applied her brakes?
"Q Yes.
"A I would say right then when I saw the car I was about 35 or 40 feet from her. I couldn't stop.
"Q You were 35 or 40 feet from Mrs. Plaisance when she applied her brakes?
"A When I noticed her car in the road I was following her about 100 feet.
"Q Could you give us some estimate as to how far Mrs. Plaisance was from Forrest Adams when he turned left across the highway?
"A I would say he was about, he was 30 to 35 feet in front of her when he cleared the right hand side of the car.
"Q You saw this vehicle make this left turn, did not not?
"A Yes.
"Q You saw him turn left across the highway, Mr. Adams?
"A Yes, sir.
"Q When Mr. Adams made that turn did you notice whether Mrs. Plaisance applied her brakes immediately?
"A I didn't notice right off the bat, no.

*705 "Q She didn't hit that vehicle, did she?
"A No.
"Q Could you tell or have you any idea how close she came to hitting the vehicle?
"A I would say about 10 or 15 feet.
* * * * * *
"Q Mr. Guidry, how fast were you driving when you were following Mrs. Plaisance?
"A Oh, about 30, 35.
"Q Would you describe the traffic conditions at that particular time?
"A They had cars coming in on us. They had some cars heading South.
"Q Do you know anything about a parade having occurred at that time?
"A No.
"Q Was the traffic conditions heavy?
"A I didn't pay attention too much about traffic condition.
"Q As I understand your testimony you were following Mrs. Plaisance about 100 feet, but when she applied her brakes to avoid hitting this car you were only 35 or 40 feet away?
"A When I saw the car was stopped.
"Q Mr. Guidry, when you saw this car turn left across the highway did you anticipate that Mrs. Plaisance would have to come to a stop?
"A No. I knew there was something. I knew that she was stopped when I saw her lights.
"Q Did you see her rear lights right at the time, did you see her rear lights light up showing a stop?
"A Yes.
"Q What time did this accident occur?
"A About 6:15, 6:20.
"Q Was it dark at that time?
"A Pretty dark.
"Q What were the weather conditions?
"A Dry.
"Q When you saw the Adams vehicle turn left you saw Mrs. Plaisance's rear lights brighten up for a stop signal, is that correct?
"A Yes.
"Q And you eventually struck her in the rear, is that correct?
"A Yes.
"Q And she avoided hitting the Adams vehicle, is that correct?
"A Yes.
"CROSS EXAMINATION
"MR. SNELLINGS:
"Q Mr. Guidry, as you neared Pierce's Texaco service station on Louisiana Highway 1 you said you were travelling about 30 to 35 miles per hour?
"A Yes.
"Q Were you going closer to 35 or closer to 30?
"A Between 30 and 35.
"Q At that point you said you were following Mrs. Plaisance about 100 feet behind her?
"A That was before we got to the station, yes.
"Q That was as you approached the far end of the station you were about 100 feet behind her, correct?
"A About.

*706 "Q Now, somewhere in that area as you went on toward the station you say that you saw Mrs. Plaisance apply her brakes, is that right?
"A Yes. I was, about when I saw the lights, when I saw the lights I was about 35, 40 feet from her.
"Q So you were about 35 or 40 feet from her when you saw her lights go on, is that correct?
"A Yes.
"Q But before you saw her lights go on you saw Mr. Adams you say make a turn to go into the service station, is that right?
"A I saw the lights, yes.
"Q At that time when you saw him make the turn to go into the service station you were still about 100 feet behind Mrs. Plaisance, is that right?
"A I don't know how far I was then when he started making his left turn.
"Q How far would you judge?
"A I would say about 75 feet.
* * * * * *
"Q Mrs. Plaisance was going about 35 miles an hour ahead of you when she applied her brakes?
"A Yes.
* * * * * *
"Q Did you notice any oncoming traffic other than Mr. Adams car?
"A Well, they had some, but I don't know who they was before or after coming on us. I don't know.
"Q You don't know whether there was any vehicles ahead of Mr. Adams car or not, do you?
"A In front of Mr. Adams?
"Q Yes.
"A Nobody was in front of him.
* * * * * *
"DIRECT EXAMINATION
"MR. LIVAUDAIS:
* * * * * *
"Q I want to clear up one thing. When you saw the Adams car starting its left turn about how far behind Mrs. Plaisance were you?
"A Oh, about 75, 80 feet.
"Q And at that time you were going about 35 miles an hour?
"A Yes, sir.
"Q To the best of your knowledge she was going about the same speed?
"A Just about.
"Q When you saw the Adams car make its left turn did Mrs. Plaisance's brake light go on at that time?
"A Yes.
"Q When you saw Mrs. Plaisance's brake lights go on did you put your brakes on?
"A Not right off. I had a little time before I could put mine on. I put mine on, but I came into her anyway.
"Q When you saw her brake lights go on is that when you started to put your brakes on?
"MR. SNELLINGS:
"I object. He's leading the witness.
"THE COURT:
"It is leading.
"MR. LIVAUDAIS:
"Q Tell us what you did when you saw Mrs. Plaisance's brake lights come on.

*707 "A I put myself in a position to put my brakes on. At that time I didn't know she was dead stopped on the road.
"RECROSS EXAMINATION
"MR. PERRY:
* * * * * *
"Q Could you tell whether or not she barely stopped in time to avoid hitting Mr. Adams?
"A It wasn't too far.
"Q What was the position of her car when she stopped with relation to the filling station?
"A Right on the highway.
"Q Was it on the North or South end of the station?
"A North end of the station.
"Q When she stopped her vehicle was on the northern end of the station?
"A Yes.
"Q And it is your testimony Adams cut into the northern end of the station, is that correct?
"A Yes."
From a review of Mr. Guidry's testimony as a whole I see nothing therein which would disclose negligence on his part. Certainly the distance he was following the Plaisance vehicle was reasonable and prudent under the particular traffic conditions. The use of modern highways requires a prudent motorist to travel within the distance the record shows Mr. Guidry was following the Plaisance vehicle.
Taken out of its context certain portions of Mr. Guidry's testimony, conceivably one might be persuaded that he was in a position to avoid striking the Plaisance vehicle; however, reading his testimony in its entirety I see nothing he could have done as a prudent driver to avoid striking the Plaisance car when confronted with the emergency created by the negligence of Mr. Adams.
Accordingly, I am of the opinion no liability attached to Mr. Guidry's insurer, Maryland Casualty Company, and the sole proximate cause of the damages sustained by Plaintiffs was the negligent action of Mr. Adams.
For these reasons I respectfully dissent to that part of the opinion of the majority holding Freddy Guidry negligent in the operation of his vehicle as a proximate cause of the accident and therefore holding the insurer of his vehicle, Maryland Casualty Company, defendant, liable to Plaintiffs, jointly and in solido, with the Defendant, insurer of Adams' vehicle.