142 So.2d 427 (1962)
DELTA EQUIPMENT & CONSTRUCTION CO., Inc.
v.
W. G. COOK, d/b/a Cook Construction Co.
No. 5399.
Court of Appeal of Louisiana, First Circuit.
May 16, 1962.
Rehearing Denied June 29, 1962.
*428 Kantrow, Spaht & Kleinpeter, by Carlos G. Spaht, Baton Rouge, for appellant.
McGehee & McKinnis, by E. Drew McKinnis, Baton Rouge, for appellee.
Before LOTTINGER, LANDRY and REID, JJ.
*429 LANDRY, Judge.
This is a redhibitory action in which plaintiff, as purchaser of a Manitowoc Model 4500 dragline machine equipped with a 140 foot boom and a Cummins NVHS diesel engine (bought from defendant for the price and sum of $110,700.00), seeks not rescission of the sale but return of the purchase price paid and certain alleged expenses incurred by plaintiff because of purported defects in the dragline which rendered it unfit for the purposes for which it was purchased. Plaintiff judicially tendered return of the dragline (sometimes hereinafter referred to simply as "the machine", "the rig", or "the equipment") but instead of praying for rescission of the sale prayed for judgment in the aggregate of $165,700.00, representing the purchase price of the machine and certain alleged expenses incurred by plaintiff in the repair and maintenance thereof subsequent to the sale.
The day following institution of this lawsuit, plaintiff sold the equipment to a third party thus converting this action to a demand for reduction of the purchase price thereof. Ehrlich v. Roby Motors Co., 166 La. 557, 117 So. 590.
Without assigning written reasons therefor, the learned trial court rendered judgment in favor of plaintiff and against defendant in the sum of $30,000.00. From said adverse judgment defendant has prosecuted this appeal.
The defense tendered on behalf of appellant is essentially that title to the equipment in question was transferred to plaintiff under the terms of a written contract of sale entered into by and between the parties at Jackson, Mississippi on June 12, 1956 and consequently, the contract is governed by the laws of the state of Mississippi and must be interpreted according to the laws of our said sister state. Defendant further maintains that under Mississippi law the sale of a movable by any party other than the manufacturer carries no implied warranty but rather the doctrine of "caveat emptor" or "purchaser beware" applies in the absence of express warranty by the vendor. On said premise defendant argues that since the Mississippi contract (hereinafter set out in full) contains no express warranty of the equipment therein described, plaintiff purchased same at his own risk and defendant is not responsible or liable for any defects therein. Alternatively, defendant maintains that the dragline in question was free of defects and suitable for the purposes for which it was purchased by plaintiff.
On the other hand, plaintiff maintains that the Mississippi contract of June 12, 1956 was not a completed sale but merely an agreement to buy and sell; that no title was transferred thereunder and that title did not in fact pass until consummation of a sale with chattel mortgage subsequently entered into between the parties under date of June 25, 1956, which latter transaction was a Louisiana contract duly recorded in this state.
In contending that the contract of sale herein involved was consummated and completed in the state of Mississippi on June 12, 1956, learned counsel for defendant relies upon the provisions of LSA-R.C.C. Article 2456 and the jurisprudence thereunder to the effect that as between vendor and purchaser title to a movable passes as soon as there exists agreement upon the object and price irrespective of delivery of possession or payment of the agreed price.
Although learned counsel for defendant does not specifically so state in his brief, his position in this regard is unquestionably based on the premise that where the courts of this state must apply the laws of another state, the law of such other state will be presumed to be the same as the laws of this state in the absence of proof to the contrary.
Esteemed counsel for plaintiff argues that the agreement of June 12, 1956, executed in Jackson, Mississippi was merely an agreement to buy and sell and as such merely part of the preliminary negotiations which culminated in the actual transfer of June 25, 1956, which latter transaction is a Louisiana *430 sale. Counsel for plaintiff further contends that since the sale in question was confected in Louisiana, the provisions of Article 2520 LSA-R.C.C. apply and, therefore, defendant vendor impliedly warranted the machine to be suitable for its intended purpose. Counsel for plaintiff, however, concedes that plaintiff having sold the machine to a third party, is therefore unable to make return thereof to defendant and is consequently limited to recovery of the difference in value between a sound and an unsound article. Able counsel for plaintiff further argues that in addition to reduction in price, plaintiff is entitled to damages because of defendant's alleged failure to disclose known vices in the equipment and also because of defendant's reputed misrepresentation of the capacity of the equipmentall as provided for by Articles 2545 and 2547 LSA-R.C.C.
From the foregoing, it is obvious that the first issue to be resolved is whether the sale which is the subject matter of this suit must be interpreted according to the laws of the state of Mississippi or those of this state.
The courts of this state have consistently followed the well recognized majority rule that the effect attributed to a contract and the rights, duties and obligations of the parties arising thereunder and flowing therefrom are, as a general rule, to be determined by the laws of the state in which the contract is executed. Moore v. Burdine, La.App., 174 So. 279; Lewis v. Columbia Mut. Life Ins. Co., La.App., 197 So. 619.
The jurisprudence of this state is also well settled to the effect that the courts will not take judicial notice of the laws, statutes or decisions of a sister state but that such laws, statutes and decisions, when applicable, must be alleged and proved in the same manner as any other material and relevant fact otherwise the laws of such other state shall be presumed to be the same as those of this state. Sheard v. Green, 219 La. 199, 52 So.2d 714; Welch v. Jacobsmeyer, 216 La. 333, 43 So.2d 678.
Since the alleged sale of June 12, 1956 must be interpreted in the light of Mississippi law, we shall now proceed to consider whether the record contains evidence of the law of that state regarding the circumstances under which title of a movable passes from vendor to purchaser. If evidence thereof appears in the record, the agreement of June 12, 1956 must be interpreted in the light of Mississippi law otherwise it must be construed according to the law of this state on the assumption that the law of the state of Mississippi is identical with the law of this state.
By stipulation appearing in the record, counsel for both plaintiff and defendant agreed that either counsel might introduce decisions of the Mississippi Courts as evidence of Mississippi law without the necessity of further proof and, in addition, consented to consideration by the trial court of any reported decision of the Supreme Court of Mississippi in determining Mississippi law insofar as same may be applicable herein. We deem it advisable to quote said stipulation in full as follows:
"MR. SPAHT: It is agreed and stipulated that either counsel for plaintiff or defendant may offer to the Court decisions from the reported cases as being the law of Mississippi without the necessity of producing an attorney from that state who will testify that that is a decision of the appellate court, and that the Court can take into consideration any reported decisions from the Supreme Court of the State of Mississippi as reported in Southern Reporter or the original Mississippi reports, or otherwise.
"MR. McKINNIS: And, Your Honor, pursuant to that stipulation we would ask the court to take judicial cognizance of the decisions of the Mississippi court in the following two cases: Touchstone versus Bond [223 Miss. 487], 78 Southern (2d) 463, and Dowling versus Smyley [150 Miss. 272], 116 Southern 294, and with that, Your Honor, we rest."
*431 In pursuance of the foregoing stipulation learned counsel for defendant cited in his brief only one Mississippi decision, namely, Watts et al. v. Adair, 211 Miss. 777, 52 So. 2d 649, an opinion rendered in 1951 by the Supreme Court of Mississippi to the effect that there is no implied warranty in the sale of a movable other than by the manufacturer thereof.
Illustrious counsel for plaintiff relies upon the decisions cited in the stipulation, supra, and also that of Merchants' & Manufacturers' Bank of Ellisville v. P. J. Toomer Lbr. Co., 115 Miss. 647, 76 So. 565, handed down by the Supreme Court of Mississippi in 1917. The Dowling case, supra, cited by counsel for plaintiff is authority simply for the proposition that a contract is the exponent of its own terms and all previous understandings and agreements are merged in the contract upon its reduction to writing. The Touchstone case, supra, holds only that misrepresentation by a seller of a material fact inducing purchase, is a fraud in law notwithstanding the vendor's lack of knowledge of the truth of the statement and is ground for avoidance of a sale. The remaining authority cited and relied upon herein by counsel for plaintiff is that of Merchants' & Manufacturers' Bank of Ellisville v. P. J. Toomer Lbr. Co., 115 Miss. 547, 76 So. 565, a decision of the Mississippi Supreme Court, which holds, with respect to transfer of title, as follows:
"* * * the question whether the title thereby passes from the vendor to the vendee depends upon the intention of the vendor, which intention is to be gathered from all the circumstances of the transaction. Emery Sons v. [Irving Nat.] Bank, 25 Ohio St. 360, 18 Am. Rep. 299. See, also, for a discussion of this question, Mechem on Sales, vol. 1 §§ 788, 789 and 790."
We reiterate that the law of this state is that judicial cognizance will not be taken of the statutes and laws of another state. Navarrette v. Joseph Laughlin, Inc., La. App., 20 So.2d 313 and that the laws of another state, where applicable, must be alleged and proven during trial the same as any other material fact. Associates Discount Corporation v. Bogard, 229 La. 389, 86 So.2d 76. We are fully cognizant of the liberal application and extension of the last mentioned rule indulged in by our brothers of the Court of Appeal, Orleans (presently the Court of Appeal, Fourth Circuit) in Smith v. Northern Insurance Company of New York, 120 So.2d 309, wherein our colleagues, despite the pronouncements of the Supreme Court in Taylor v. Terzia, 171 La. 1040, 132 So. 781, predicated upon a stipulation similar to that involved in the case at bar, considered authorities cited in the brief of counsel but not formally introduced and offered in evidence.
We seriously question the rationale of the rule adopted in the Smith case, supra, and while for reasons hereinafter stated, we will follow the rule in the instant case we are most certainly not disposed to further extend or relax its application to the extent that we will consider decisions and statutes of another state neither offered in evidence nor cited in brief, stipulation of counsel to the contrary notwithstanding.
Granting the right of counsel to stipulate as to the applicable law of another state just as counsel may agree upon and stipulate any other material fact and thus obviate the necessity of proof thereof, a stipulation or agreement as to what the law of another state holds is vastly different from a stipulation that the courts of this state may consider any decision or law of another state irrespective of whether same is offered in evidence or alluded to in brief. The latter situation imposes upon the judiciary an unconscionable burden and compels judicial discharge of a burden patently incumbent upon counsel. Moreover, we do not possess either the facilities necessary to independently research the entire law of each of our 49 sister states or the time to devote to such purpose where such facilities at our disposal.
*432 However, since counsel in the instant case have agreed that either may cite decisions of the State of Mississippi as proof of the law of our said sister state, we will give effect to the aforesaid stipulation and in so doing deem the law of Mississippi to be, on authority of Merchants' & Manufacturers' Bank of Ellisville v. P. J. Toomer Lbr. Co., supra, that insofar as a sale is concerned title to the object sold does not pass until the vendor intends the transfer to be effective such intent being determined in each instance by the attending circumstances. Such is the law of Mississippi in evidence herein under the stipulation mutually agreed upon by counsel for the respective litigants at bar. Counsel for plaintiff having proved the law of Mississippi in the manner indicated, the court will apply same to the case at bar.
We shall now proceed to examine the evidence to determine whether defendant intended to pass title to the machine on June 12, 1956, or whether, as contended by plaintiff said agreement did not constitute a sale under Mississippi law and consequently title did not pass until execution of the Act of Sale with Chattel Mortgage signed by plaintiff in Baton Rouge, Louisiana, June 25, 1956.
The litigants at bar are in accord regarding the facts and circumstances surrounding the sale of the equipment in question, the only dispute between them concerns the conclusions to be drawn therefrom.
On June 12, 1956, plaintiff and defendant entered into the following written agreement in Jackson, Mississippi, to-wit:

"AGREEMENT
"This agreement entered into this 12 day of June, 1956 between W. G. Cook, Jackson, Mississippi, seller, and Delta Equipment and Construction Company, Inc., 3324 Delaware Street, Baton Rouge, Louisiana, wherein seller agrees to sell and purchaser agrees to buy 4500 Manitowac Dragline, Serial No. 4524, equipped with 140 foot boom and five yard Hendrix Dragline Bucket, located f. o. b. New Madrid, Missouri for the purchase price of $110,700.00 payable $25,000 cash, balance $85,700.00 payable in sixteen (16) equal monthly installments of $5,356.25 per month, first installment due August 15, 1956 and the 15th day of each month thereafter with eight (8%) percent interest after maturity. Purchaser to carry necessary insurance to protect interest of seller with loss payable clause in favor of seller.
Sgd/ W.B. Patterson Sgd/ A.A. Lindley, Pres. 
Witness Delta Equipment and Construction Co.
 A.A. Lindley, President-Purchaser
Sgd/ Donna Murphy Sgd/ W.B. Cook 
Witness Cook Construction Company
 W.G. Cook, Owner-Seller"
The contract of June 12, 1956 so heavily relied upon by defendant herein does not per se contain language of complete, unconditional sale and immediate transfer of title but in plain language provides, inter alia, that "seller agrees to sell and purchaser agrees to buy" which is terminology presumptive of an agreement to buy and sell rather than an immediate sale.
Prior to execution of the agreement of June 12, 1956, plaintiff and defendant negotiated for the sale of the machine said negotiations being conducted principally by telephone. Before execution of the first agreement, Mr. A. A. Lindley, President of plaintiff corporation, went to New Madrid Missouri and made a cursory inspection of the machine which had not been used for a *433 period of two and one-half years and which was then "in mothballs" on the bank of the Mississippi River. Subsequently an employee of plaintiff corporation was sent to inspect the machine but on neither occasion was an attempt made to operate the equipment. Still later Mr. Lindley returned to Missouri where he was met by defendant's agent, Robert L. Jones, who started the engine of the machine and demonstrated its ability to move forward and backward. Mr. Jones, however, could not demonstrate the machine's ability to move dirt for the reason that the dragline bucket was not attached thereto at the time. It further appears that at this time Lindley was seriously considering the purchase of a similar machine from another source but upon defendant's representation that the machine in question was only five years old, in good condition, the engine had been overhauled and that it had only moved approximately one and one half million yards of dirt, Lindley entered into the agreement to purchase same on behalf of plaintiff corporation. Although defendant denied telling Lindley the machine was only 5 years old when it was in fact 7 years old (Tr. 413) upon being confronted with his testimony wherein he conceded the equipment was 7 years old (Tr. 438) he admitted he had previously so testified. In this regard it may appropriately be said that defendant's testimony concerning his representations to Lindley were somewhat evasive and contradictory as it was on several other points.
Upon agreement as to the basic terms for the sale of the machine the contract of June 12, 1956 was entered into at Jackson, Mississippi, in pursuance of which plaintiff paid defendant the sum of $25,000.00 called for therein. Upon execution of the agreement in Mississippi, defendant instructed his Louisiana attorney to prepare the papers necessary to consummate the agreement. Simultaneously with the preparation of the Sale and Chattel Mortgage which was eventually signed and executed by and between the parties, defendant's attorney drafted a resolution authorizing the president of plaintiff corporation to purchase the machine for, in the name and on behalf of plaintiff corporation, which resolution bears date of June 23, 1956. A formal act of sale containing a vendor's lien and chattel mortgage was prepared by defendant's attorney and transmitted to defendant who signed same in Jackson, Mississippi. Defendant returned the executed documents to Baton Rouge, Louisiana, where the sale and chattel mortgage with accompanying promissory note was executed by plaintiff's president, A. A. Lindley, pursuant to the resolution prepared by defendant's attorney. The Act of Sale with Chattel Mortgage contained many important provisions favorable to defendant vendor, including but not limited to, acceleration clause, pact de non aliendo, confession of judgment and insurance clause. The note executed by plaintiff provides for its payment at the Whitney National Bank, New Orleans, Louisiana. Following its execution the Act of Sale with Chattel Mortgage was recorded in Louisiana. Plaintiff then rented a barge and had the subject equipment towed to Baton Rouge, Louisiana, where it was permanently mounted upon a barge which plaintiff outfitted with living quarters and other equipment and apparata necessary to convert the dragline and barge into a self-contained unit capable of operating on water.
There is virtually no dispute but that the parties understood the dragline would be used by its purchaser primarily within this state. In addition to the foregoing circumstances which would seem to indicate the intention of vendor not to part with title to the dragline until confection of the Act of Sale with Chattel Mortgage which was passed June 25, 1956, no better further evidence of such intention could be found than defendant's own testimony on cross-examination as revealed by the following appearing at Page 137 of the record (Page 72 of the transcript of testimony):
"Q To your knowledge, Mr. Cook, the last thing that was done toward the *434 execution of this sale and chattel mortgage occurred in Louisiana?
"A The signature occurred in Louisiana by Mr. Lindley of the chattel mortgage, the sale having previously been made on June 12th in our office in Jackson, Mississippi.
"Q And, of course, you are stating your opinion concerning the nature of the document which was signed on June 12, 1956?
"A That was the sale.
"Q That's your opinion, is it not? The document doesn't say `sale', does it?
"A Subject to signing a chattel mortgage. That's the only condition that wasn't completed in Jackson, Mississippi, at the time. The payment was made and the possession of the machine was turned over to Mr. Lindley.
"Q As a matter of fact, the agreement states that you agreed to sell, does it not, not that you sold to him?
"A I certainly couldn't transfer title to the machine until I collected my $25,000.00 and collected my chattel mortgage and notes if that is what you mean.
"Q You didn't transfer title?
"A I didn't transfer title, no."
In this same connection we note the testimony of defendant appearing on Pages 431-433 of the record, pages 366-368 of the note of evidence:
"Q Mr. Cook, did you previously testify in this matter to the effect that you did not intend to pass title to this dragline until the papers were properly recorded and you had a valid mortgage?
"A My answer to your question is that the sale executed in my office constituted the sale of the machine to Mr. Lindley.
"Q Now, of course your answer is not responsive to my question, you are not answering my question.
"A I think I can answer your question if you will let me go on.
"Q No, I am asking you what you testified to in court. I am not asking what your intention was. Did you testify, Mr. Cook,
"MR. SPAHT: If Your Honor please, he didn't ask him exactly what he said. He asked him what the content of his testimony
"A What my intentions were and what I did are two different things.
"MR. SPAHT: Just answer the question.
"THE COURT: Let's get the question.
"Q (Question read: Mr. Cook did you previously testify in this matter to the effect that you did not intend to pass title to this dragline until the papers were properly recorded and you had a valid mortgage?)
"THE COURT: Well, you didn't ask him for the exact words he used, but you asked him if he testified to the effect. Now, in the opinion of the Court the answer of the witness was not responsive to the question. He went on to say something. If you can answer the question, and the question is very simple
"A It was the intention of both parties that I be secured by the outstanding balance due on the machine at all times.
BY THE COURT:
"Q No, he is not asking you what your intention was, he is asking you did you testify to that effect on a previous occasion?
"A Well, the record will reflect what I testified to.

*435 "Q Well, he has a right to examine you as to your recollection as to the question of whether or not you testify the same today
"A I don't believe I did then, I don't believe I would do it now without a retention title note or chattel mortgage.
BY MR. McKINNIS:
"Q Say that again.
"A I don't believe I would transfer title to the machine without the benefit of retention title note or chattel mortgage.
"Q You testified to that previously?
"A That's correct."
Able counsel for defendant seizes upon the fact that at the time of execution of the agreement in Jackson, Mississippi, plaintiff paid the sum of $25,000.00 as a deposit or down payment consequently the sale was therefore consummated and title passed for there is no showing that said sum could, under Mississippi law, be considered earnest money subject to forfeiture by plaintiff in the event the contract were only a contract to buy and sell. The law of Mississippi in this regard has not been established by either party and must therefore be presumed to be the same as that of our own state which would render it in the nature of earnest money. The question thus posed, however, would appear moot considering there was no attempt at forfeiture and a sale was subsequently executed between the parties on June 25, 1956.
We hold, therefore, that title to subject equipment did not pass to plaintiff purchaser under the agreement of June 12, 1956, for the reason that under Mississippi law the clear intention of defendant vendor was that no transfer of ownership would take place until execution of the formal sale with chattel mortgage which was subsequently entered into between the parties to this present litigation. It follows that title did not vest in plaintiff herein until the execution of the Louisiana Act of Sale with Chattel Mortgage and that the rights of the parties must be determined under said latter contract.
Defendant purchased the machine in question in 1949 for the sum of $135,976.00. It was used by defendant on several jobs the last being in or near New Madrid, Missouri which project defendant completed in late 1953.
The Manitowoc purchased by plaintiff was designed for use with a bucket having a capacity of five cubic yards. After being mounted on plaintiff's barge it was cleaned, painted, otherwise readied for use and the barge then towed to Marsh Island where plaintiff was engaged in fulfilling a marine dredging contract with a similar type machine known as a 111 Marion. Plaintiff started the Manitowoc on the same kind of operation in which the Marion was involved but the Manitowoc very soon began to smoke and leak oil. It was also very quickly discovered that subject machine was underpowered in that its engines could not generate enough energy to efficiently and properly operate the bucket attached thereto which, the evidence shows, was the size bucket recommended for use with such equipment. A bucket of smaller capacity was then installed on the machine and plaintiff thereafter used same for the lighter task of cleaning up behind the Marion. The machine was thus employed for a period of approximately two weeks during which period and the ensuing two weeks in which it was similarly utilized at Bayou Lamoque, it was out of operation undergoing repairs for a total of 7 days. Trouble was experienced with the "air cylinders on the drag drum". The oil seals on the torque converter had to be changed because the machine was wasting approximately ten gallons of oil each eight hour shift. In addition the supercharger disintegrated and no replacement could be found therefor. During the time subject equipment was used on the same project as the Marion, the latter machine was called upon to perform 80% of the work which should have been *436 divided equally between the two pieces of equipment.
To prove that the machine was defective plaintiff called as a witness Mr. R. J. Arroyo, of New Orleans, Louisiana, Division Manager for Cummins Sales and Service, Inc. Mr. Arroyo testified that for a number of years he had been in the employ of Cummins, manufacturer of the Model NV HS diesel engine with which subject machine was equipped. He occupied the position of Division Manager since 1952. Shortly after the sale of the machine to plaintiff, Arroyo was contacted by Lindley and advised of its purchase by plaintiff corporation. Arroyo informed Lindley that certain parts of the engine such as the supercharger and water pump were unobtainable and could not be supplied by Cummins. Arroyo testified that the NVHS engine in the machine was obsolete and no longer in production by the Cummins Company because of certain defects therein consisting primarily of unsatisfactory performance of the attached superchargers. According to Arroyo an ordinary aspirated engine of this type is rated at and produces 400 horsepower while with the use of a supercharger (which device forces additional air into the engine thus increasing combustion) it produces energy equivalent of a 550 horsepower rating. Defendant himself concedes that an engine of 500 horsepower or more is required to properly operate the machine at maximum efficiency using the size bucket for which the equipment was designed and intended and that without a properly functioning supercharger the engine would not produce sufficient horsepower to perform satisfactorily. According to Arroyo, the machines were redesigned so that the forced air intake was changed from a supercharged system to an exhaust-driven turbocharged system. In Arroyo's experience he had found no supercharged NVHS engine to perform satisfactorily without the suggested modifications. He also stated that the Cummins Company recognized the initial deficiency in the NVHS engine and, under factory warranty policy, modified all such engines not in use more than one year to turbocharged engines at company expense. He was not certain that the company offer of modification had been made to defendant since the sale to defendant did not take place in Arroyo's territory. Arroyo frankly admitted the reputation of the engine was not good.
When the supercharger disintegrated approximately 30 days following plaintiff's purchase of the machine, Lindley contacted Arroyo for a replacement. Arroyo informed Lindley that superchargers were no longer available. At this time Arroyo offered plaintiff a conversion kit consisting of the parts necessary to change the engine to a turbocharged motor at a cost of approximately $3,300.00 exclusive of labor. The suggested modification necessitated new cam shafts and rerouting of all water and lubricating lines, the total cost of which (including $3,300.00 for parts) Arroyo estimated at approximately $5,000.00. As an alternative Arroyo proposed to furnish plaintiff a completely new DT engine with a trade in allowance being made plaintiff on the old NVHS motor. According to Arroyo the NVHS turbocharged would develop a horsepower rating of 600 and without either supercharger or turbocharger the machine could not perform the work for which it was intended. He conceded that without either supercharger or turbocharger the equipment would be adequate for use with a smaller boom and bucket, but unequivocally testified that a properly operating supercharger or turbocharge was indispensable to operation of the machine at its rated capacity. He also testified that to modernize the obsolete engine a new waterpump and new camshafts would be required. Arroyo offered to replace the NVHS engine with turbocharged model VT 121 at a cost of $12,640.00 less a trade-in of $1850.00 for the old unit. Installation of the new engine would cost an additional estimated $2000.00. In the opinion of Arroyo mere visual inspection would disclose whether an engine were supercharged or turbocharged but *437 such inspection would not reveal defects therein unless one were familiar with the previous history of the NVHS engine.
Sidney White, of Jackson, Mississippi, a sale representative of Cummins Diesel Sales Corporation, called as a witness on behalf of defendant, testified he had been so employed as a mechanic and salesman for a total of 11 years, the last six of which have been in the capacity of salesman. He acknowledged that the Cummins Company made changes in the design of the NVHS engine and altered the method of air intake from supercharger to turbocharger. He also conceded that the engine had to be supercharged or turbocharged to attain its maximum rated capacity and output. Although he admitted the NVHS engine was no longer in production he was understandably most reluctant to use the word "obsolete". He was aware of the Cummins program to convert all NVHS engines to turbocharged systems and attributed his employer's modification offer to the fact that supercharger life expectancy was less than originally anticipated. He frankly stated that experience showed the superchargers with which the machines were initially equipped failed in approximately 1600 to 1800 hours use whereas they should have lasted the life of the engine itself which he acknowledged to be many thousands of hours operation. He knew of no part of the engine that was unavailable for repair but never had occasion to order a supercharger.
Michael Kelleher, a graduate Mechanical and Electrical Engineer who studied at Edinburgh, Scotland, testifying on behalf of plaintiff, stated that he has had experience with equipment similar to that involved herein since 1948. He has been in the employ of the Manitowoc Company for 10 years and presently served in the capacity of its Louisiana representative. Kelleher testified that his company discontinued offering the NVHS supercharged Cummins engine until Cummins designed a new type with a turbocharger. To his knowledge the Cummins NVHS supercharged engine had been found unsatisfactory for use on the Model 4500 Manitowoc machines because the superchargers failed to perform properly and consequently the engines thus equipped did not develop their full rated horsepower. According to Kelleher a supercharger or turbocharger should be the last component of an engine to fail. Such devices, in his opinion, should last as long as the engine itself. In the opinion of Kelleher installation of three new superchargers in a period of three years (as admitted by defendant) indicated either that the superchargers were defective or that the engine was incapable of developing its rated horsepower with the supercharger. Kelleher saw the machine at Marsh Island at which time he found the radiator overheating badly. Although he saw the machine after it had been cleaned, painted, repaired and made to look like new he valued the machine then at a maximum of $80,000.00 and estimated an expenditure of $40,000.00 would be required to make it "as good as new".
The fact that the machine began to give trouble shortly after plaintiff placed it in use is corroborated by plaintiff's employee Ellis M. Furr who testified that the dragline was constantly breaking down because of trouble with the torque converter, supercharger and oil seals. He also testified that the wing drum had an old crack in it which condition was discovered approximately one week following purchase of the machine.
Approximately one month after plaintiff placed the equipment in operation it was moved from Bayou Lamoque to the Harvey Canal at New Orleans, Louisiana, and leased to J. Ray McDermott Company which concern, at the time, was interested in purchasing the equipment. According to C. A. Beason, Superintendent, the McDermott Company is engaged in the dredging business and owns 16 or 17 similar rigs. During McDermott's use a new clutch and new oil seals were required and the supercharger failed to work properly thus resulting in considerable shut down time and a consequent *438 loss in production. The machine was taken in for repair and inspection then showed the right swing drum to be cracked, the left swing drum in bad condition although not cracked and the circle considerably worn. Dissatisfied with the performance of the equipment Beason's employer returned it to plaintiff in two weeks.
Allison Vance, a former employee of plaintiff (upon whose recommendation Lindley purchased the equipment in question) testified that upon viewing the drag-line in Missouri he was then unable to make a complete inspection thereof because it had not been in operation for a considerable time and he was unable to start the engine. He further stated that predicated upon his knowledge of such equipment, he valued the machine at approximately $80,000.00 and so advised Lindley. Despite his relation of the many mechanical failures encountered, Vance stated he was satisfied with yardage production during the time he was employed by plaintiff and worked with the machine in question. Vance further testified that he considered the engine generated sufficient power and was of the opinion that considering the length of time the machine had remained idle he believed its performance satisfactory. In many respects Vance's testimony is inconsistent with and contrary to the preponderance of evidence appearing in the record and particularly so in that he stated the supercharger gave no trouble during the four week period in which he worked on it at Marsh Island and Bayou Lamoque. It appears that Vance left plaintiff's employ at the time plaintiff was experiencing the most difficulty with the equipment although his reason for leaving does not clearly appear in the record.
In an attempt to show that the equipment was in good condition and free of redhibitory vices or defects at the time of the sale defendant offered the testimony of Robert Lee Jones, an employee of defendant with 38 years experience as a dragline operator, the last 11 of which were with defendant Cook. Jones' experience with the equipment in question was during the first six months of Cook's ownership thereof and ten days during its last operation in Missouri before it was idled. He acknowledged that the Manitowoc Company installed a new circle on the machine upon completion of its first project. Jones also testified that the engine was overhauled approximately two weeks before the machine was left at New Madrid, Missouri. When last used the engine produced adequate power to properly operate the equipment with a five yard drag bucket. He also testified that while he was on the machine he did not recall experiencing difficulty with the supercharger or torque converters even though defendant Cook concedes that during the time defendant used the equipment the supercharger was changed on three occasions. It is quite possible, of course, that the admitted replacements were made at times when Jones was not operating the equipment.
Defendant Cook proved to be a somewhat evasive witness. He testified in substance that the machine proved entirely satisfactory during his use thereof; that he was unaware of any defects therein and that he expended thereon only normal outlay for repairs and maintenance but acknowledged the supercharger was changed three times, namely, August 30, 1950, August 14, 1952 and August 28, 1953. In a deposition taken previous to trial he stated that he had never tried to purchase a supercharger for the engine and after admitting its having been changed on three occasions explained that he did not attempt to purchase a supercharger for the machine after its sale to plaintiff. He denied making any specific representations to Lindley concerning the condition of the machine save and except that it was in good condition.
A. A. Lindley, President of plaintiff corporation, testified in essence that he explained to Cook the precise nature of the work to which Lindley proposed to devote the equipment and that Cook assured him the machine was in first class condition, was capable of doing the work and had been overhauled before it was laid up. In effect *439 Lindley testified that but for Cook's representations concerning the machine, he, Lindley, would have purchased another similar machine admittedly older than subject rig but offered to Lindley for the sum of $75,000.00. Lindley also attested to the fact that the machine gave trouble from the inception; that repair parts were impossible to obtain and that considerable time and production were lost because the machine was down for repairs.
The evidence clearly preponderates in favor of the conclusion that plaintiff purchased a machine with nonapparent redhibitory vices and defects consisting inter alia, but principally, of the defective condition of the engine which supplied its motive power. It further appears that the engine was defective in that the superchargers which were intended to provide additional horsepower to fulfill the requirements for which the equipment was designed needed frequent replacement and at the time of the purchase were no longer obtainable. On this latter issue there is some evidence to the effect that the Cummins Company may perhaps have had a small number of superchargers on inventory in a warehouse but the conclusion is inescapable that they were not made available to prospective purchasers and that neither the representatives of Cummins nor those of manufacturer of the Manitowoc were able to obtain a replacement supercharger when plaintiff was in need thereof. Not only was the engine of the machine shown to be obsolete it also appears with reasonable certainty that at the time of sale a welded crack in the right drum had again cracked, a fact which could not be ascertained upon simple inspection.
Learned counsel for plaintiff maintains that the machine having been shown to be defective the purchase price should be reduced by the difference between the actual value of the machine at the time of its sale and the sale price of $110,700.00. Esteemed counsel for defendant urges that if the judgment in favor of plaintiff be affirmed, it should be reduced to the cost of repairs shown to be necessary to render the equipment sound. Defendant contends that the cost of such repair would be only the sum of $915.75 (the cost of the last supercharger purchased by defendant) or at most the sum of $5,000.00 required to convert the engine from a supercharged to a turbocharged injection system.
The jurisprudence of this state (except for Morehouse Ice Co. v. Tooke & Reynolds, La.App., 154 So. 402 and Britt v. Leaderbrand, La.App., 39 So.2d 645, hereinafter discussed) appears well settled to the effect that in an action in quanti minoris the amount recoverable by the purchaser is the difference between the value of the thing sold in its defective condition and its value as warranted. Iberia Cypress Co. Limited v. Von Schoeler, 121 La. 72, 46 So. 105. In cases involving the sale of real estate, however, where there has been no resale and the difference in value is therefore not easily and readily ascertainable, the allowable recovery has been held to be the cost of repairs necessary to make the thing whole. Wilfamco, Inc. v. Interstate Electric Co., 221 La. 142, 58 So.2d 833; Lemonier v. Coco, 237 La. 760, 112 So.2d 436.
Iberia Cypress Co. Limited v. Von Schoeler, supra, is also authority for the rule that the purchaser who seeks damages for the cost of repairs as well as a reduction in price for the difference in value of the article may not recover both but is only entitled to the difference in value.
A seeming departure from the above rule appears to have been made by our brothers of the Second Circuit in Morehouse Ice Co. v. Tooke & Reynolds, La.App., 154 So. 402, wherein the sale of an icehouse was involved. The court therein allowed recovery of the cost of repairs necessary to make the object sound and stated, inter alia, that whether the purchaser sued for the reduction of the price eo nomine, the measure of which is the difference in value of a sound and unsound article, or whether he sues for the amount necessarily expended by him to convert the unsound article *440 into one of soundness is a distinction without a difference. A careful reading of the Morehouse Ice Co. case, supra, reveals that therein the purchaser did not sue for a reduction in price but for the cost of repairs necessary to make the thing whole. In Britt v. Leaderbrand, La.App., 39 So.2d 645, our colleagues of the Second Circuit permitted recovery of the cost of repair to a two-compartment meat and vegetable cooler but again the plaintiff therein prayed only for repairs and not difference in value.
Excepting instances involving the sale of real property we know of no case in which the Supreme Court has allowed, limited or restricted recovery in a redhibitory action to the cost of repairs. In this regard we note the following language appearing in Lemonier v. Coco, 237 La. 760, 112 So.2d 436.
"In a successful action for a reduction of the purchase price the amount to be awarded is the difference, at the time of the sale, between the value of the thing sold in its defective condition and its value as warranted. Iberia Cypress Co., Limited v. Von Schoeler, 121 La. 72, 46 So. 105. However, with respect to the sale of realty, unless there has been an immediate resale, the difference is not readily and easily ascertainable. As a consequence this court has declared that in such a case the allowable diminution is `the amount necessary to convert the unsound structure into a sound one' (McEachern v. Plauche Lumber & Construction Co., Inc., 220 La. 696, 57 So.2d 405, 408) or, as otherwise expressed, `the cost of repairs necessary to make the thing whole' (Wilfamco, Inc. v. Interstate Electric Co., 221 La. 142, 58 So.2d 833, 834)."
We believe the soundness of the rule thus established by the Supreme Court's refusal to use the cost of repairs as the measure of diminution of price in all redhibitory action cases is demonstrated by the fact that cost of repair is impossible of application to vices in irreparable objects, such as, for example, unsound corn. See Peterkin v. Martin, 30 La.Ann. 894.
Kelleher and Vance each valued the machine at approximately $80,000.00 in the condition in which it existed at the time of sale. Beason ascribed a maximum value thereto in the sum of $65,000.00. The trial court evidently accepted the testimony of Kelleher and Vance for judgment was rendered below in favor of plaintiff in the sum of $30,000.00 which represents the approximate difference in the value of the drag-line as established by said witnesses and the purchase price of $110,700.00. It is unnecessary to determine the exact cost of repairing the various defects which rendered the equipment useless for its intended purpose for, as hereinabove shown, the measure of plaintiff's recovery is the difference in value, not the cost of repairs. Unlike cases dealing with realty the difference in value in the instant case was readily ascertainable and has been shown with reasonable certainty by competent expert testimony. We believe no useful purpose would be served by a remand for the introduction of further evidence to determine the extent of diminution in value as was done in Lemonier v. Coco, supra, and Foster & Co. v. Baer & Co., 7 La.Ann. 613.
We believe the award of $30,000.00 made by the learned trial court represents the diminution in value established by the record before us and accordingly, affirm the judgment appealed from.
Assuming arguendo, the record supported plaintiff's claim for damages and expenses in addition to diminution of price because of defendant's alleged misrepresentation of the quality of the machine and failure to disclose known vices as provided for in Articles 2545 and 2547 LSA-R.C.C., no increase in the award could be made in plaintiff's favor for the reason plaintiff has neither appealed nor answered the appeal of defendant herein.
Judgment affirmed.