183 So.2d 68 (1966)
Douglas SELF, Plaintiff and Appellant,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al., Defendants and Appellees.
No. 1640.
Court of Appeal of Louisiana, Third Circuit.
February 15, 1966.
*69 Wood & Jackson, by W. R. Jackson, Jr., Leesville, for plaintiff-appellant.
Stockwell, St. Dizier, Sievert & Viccellio, by Fred H. Sievert, Jr., Lake Charles, for defendants-appellees.
Before SAVOY, CULPEPPER and HOOD, JJ.
HOOD, Judge.
Plaintiff, Douglas Self, sues for damages allegedly sustained by him as a result of a rear-end motor vehicle collision. The suit was instituted against Fred W. Huffman and his liability insurer, State Farm Mutual Automobile Insurance Company. The trial judge rendered judgment in favor of plaintiff for the sum of $3482.40. Plaintiff has appealed, contending that the amount of the award should be increased. Defendants have answered the appeal, demanding that the judgment be reversed, or that the amount of the award be reduced.
The accident occurred at about 10:00 a. m. on January 31, 1964, on a blacktopped *70 state highway a few miles east of Leesville, Louisiana. The blacktopped portion of the highway is twenty-two feet wide and shoulders are eight feet in width on each side. The highway at that point is straight and level. At the time of the accident, the road was damp and the weather was cloudy, but visibility was good.
Immediately prior to the time of the collision, plaintiff was driving his automobile in a westerly direction on that highway at a speed of fifty-five or sixty miles per hour. Defendant was driving his automobile in the same direction at about the same speed, immediately behind the Self car. As plaintiff approached the point where the collision occurred, he saw two state troopers on the north shoulder of the highway engaged in setting up a speed-timing device. A rubber tube had been laid across the highway at one point, and the troopers were engaged in laying another tube across the road about sixty-six feet west of the first one. As plaintiff approached the troopers, he applied the brakes of his car and reduced his speed. Shortly after the brakes were applied, the Huffman car ran into the rear end of the Self car, the collision occurring within a few feet of both state troopers.
When plaintiff first observed the troopers, one of them was standing on the north shoulder of the highway holding one end of the rubber tube, so that that end was two or three feet above the surface of the ground, the other end of the tube being fastened to the ground on the south shoulder. Most of the tube lay flat on the surface of the highway which it crossed, but since the trooper was holding one end of it above the ground, about five or six feet of the north end of the tube was suspended from a few inches to a few feet above the surface of the road. Self explains that the rubber tube, which was about the size of "your little finger," appeared to him to be a wire cable, and he applied his brakes because he was afraid that if he struck it while it was suspended in the air the trooper might be injured. The trooper dropped the tube before plaintiff's car reached it, however, and Self states that he thereupon decided to drive on across it, and he thus did not intend to stop. He states that he saw the troopers as he reached the crest of a small hill about three-tenths of a mile before he reached them, that he was driving at a speed of from fifty-five to sixty miles per hour, that he began reducing his speed when he was about halfway between the hill crest and the troopers, that he first applied his brakes when he was seventy or eighty yards from the troopers, and that he had reduced the speed of his car to about thirty-five miles per hour when the collision occurred.
Huffman testified that he had been following the Self car for some distance, and that he also observed the state troopers on the shoulder three-tenths of a mile before he reached them. He states, however, that he continued to observe the car ahead of him, that Self slowed down very suddenly, that Huffman had no reason to suspect that the car in front of him would slow down or stop, and that the reduction in speed was so abrupt that he was unable to avoid a collision. He states that plaintiff gave no hand signal and that he did not see any stop lights flash on the lead car. He thinks that plaintiff had either come to a complete stop or had almost stopped at the time the collision occurred. Defendants maintain that the sole proximate cause of the accident was the negligence of plaintiff in suddenly reducing the speed of his car, in failing to maintain a proper lookout, and in failing to signal to the following vehicle that he intended to slow down or stop.
The state troopers observed both vehicles at they approached the place where the accident occurred, and they testified that the two cars "were very close together." At the time of the collision, they estimated that the Self car was traveling at a speed of about twenty-five miles per hour and that the Huffman car was traveling about forty-five miles per hour. In describing the manner in which Self applied his brakes and reduced the speed of his automobile, *71 the troopers testified that "he did not apply them too hard, but it was rather sharply, enough to make a noise in any case." They stated that Huffman applied his brakes a few seconds after plaintiff had applied his, and that the Huffman vehicle skidded and rammed into the rear end of plaintiff's car. The evidence shows that no skid marks were left by plaintiff's vehicle, but that the Huffman car left skid marks 105 feet long leading up to the point of impact. One of the troopers testified that immediately after the accident occurred Huffman said that he was looking at the troopers and that he "didn't * * * notice the Self vehicle slowing up in front of him until it was too late."
LSA-R.S. 32:81, subd. A provides, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway."
The law imposes upon a following motorist a duty to exercise great care, sometimes referred to as extraordinary care. Evans v. Thorpe, La.App. 2 Cir., 175 So.2d 418. As a rule, when a following vehicle collides with the rear of the lead car, the following driver is considered to be at fault. An exception to this general rule of law has been recognized, however, in instances where the driver of the lead vehicle negligently creates a hazard which the following vehicle cannot reasonably avoid. Zeno v. Breaux, La.App. 3 Cir., 164 So.2d 666, Emmco Insurance Co. v. St. Lawrence, La. App. 4 Cir., 127 So.2d 202, and Dykes v. Lowrance, La.App. 3 Cir., 146 So.2d 171.
The driver of a car following a few feet behind another, under circumstances such that he should anticipate the possibility of obstruction or trouble of some sort, should have his car under such control or proceed at such a rate of speed that he can stop at once if the car in front stops. Hill v. Knight, La.App. 2 Cir., 163 So. 727; Plaisance v. Maryland Casualty Co., La. App. 1 Cir., 169 So.2d 695.
An issue similar to that presented here was before us in Bouis v. The Employers Liability Assurance Corp., La.App. 3 Cir., 160 So.2d 36. There, as in this case, the lead vehicle was required to make an emergency stop and a rear-end collision occurred. We held that the emergency stop was one which should have been anticipated by the following driver, and that the latter thus was negligent in following too closely and in failing to keep a proper lookout under the circumstances.
We have considered the facts in the instant suit with these rules in mind. Our conclusion is that plaintiff, Self, did reduce the speed of his car rather suddenly, but that he was justified in doing so in the face of what reasonably appeared to him to be an emergency. We are convinced that he did not stop any more abruptly than appeared to him to be necessary after he observed the rubber tube, which might reasonably be mistaken for a wire cable, suspended above the surface of the road. We also conclude that defendant, Huffman, was negligent in following too closely behind the Self car under the circumstances presented here, and in failing to maintain a proper lookout. We think he should have anticipated that plaintiff would reduce the speed of his car when Huffman observed that both vehicles were approaching the troopers who were engaged in installing the speed-timing device on the highway.
We agree with the trial judge, therefore, that the negligence of defendant, Huffman, is the sole proximate cause of the accident, and that plaintiff is free from contributory negligence.
We turn now to the questions relating to quantum. Plaintiff was twenty-one years of age at the time the accident occurred. He states that he had experienced no difficulty with his back before that time. He was employed as a service station attendant, earning $50.00 per week, and he customarily worked from noon until midnight. He was not aware of the fact that he had sustained an injury in this accident until *72 thirty or forty minutes after the collision occurred, when he noticed a "little pain" in his back. He reported to work and performed all of the duties of his employment on the day of the accident and on the next two days. On February 4, 1964, he consulted his family physician, Dr. E. H. Byrd, a general practitioner, and remained under his treatment for a period of approximately four months thereafter.
Dr. Byrd concluded that plaintiff had sustained an acute lumbar sprain as a result of the accident. He also found that plaintiff had an abnormality of the spine, known as spondylolisthesis, and that he had a condition indicative of spina bifida, both of these abnormalities being congenital defects not caused by the accident. The treatment which he administered consisted of injections of vitamin B-12 and analgesis, and he prescribed a hard bed and local heat and rubs. He treated plaintiff periodically from February 4 until May 28, 1964, and discharging him from further treatment on the last mentioned date. He felt that plaintiff was disabled during the entire time he was treating him, but that plaintiff was "about well" when he discharged him. He testified that in his opinion plaintiff would be able to return to work at the service station about July 1, 1964, but that he would have to rehabilitate himself gradually since he had not been using his muscles for some time.
Dr. Ford J. Macpherson, an orthopedic surgeon, examined and treated plaintiff on February 21, March 27, and on May 25, 1964. On the first examination, he concluded that plaintiff had sustained a major sprain. He also found congenital anomalies in plaintiff's back consisting of a spina bifida and the existence of four free lumbar vertebrae instead of five, the fifth being completely sacrolized and slipped forward. He fitted plaintiff with a corset, and recommended that he wear it for one month. On March 27, he found that plaintiff was making excellent recovery, and he concluded that he would probably have two more months of disability. On the last examination, he reported: "There is no spasm, motion is excellent, neurological is normal, he remains slightly tender on the lumbosacral joint, but there is no evidence of sciatic irritation at this time. He was instructed on this date to begin weaning from his brace and return here in approximately one month, at which time I think the final evaluation can be made." Plaintiff did not return for any further examination or treatment by Dr. Macpherson.
Dr. C. V. Hatchette, an orthopedic surgeon, examined plaintiff on March 16, 1964. He found a Grade 1 spondylolisthesis and a spina bifida occulta, both of which he states are congenital in origin. He concluded that the pain of which plaintiff complains is caused by the spondylolisthesis, a congenital anomaly, which pre-existing condition he thinks was aggravated by the accident of February 7, 1964. He feels that plaintiff is unable to do manual labor and that a spinal fusion is necessary.
Dr. Norman P. Morin, another orthopedic surgeon, examined plaintiff on May 21, 1964. His conclusions as to the result of this examination are shown by the following portion of his testimony:
"I felt that on the basis of this physical examination and x-ray of May 21, 1964, that (1) he had completely recovered, with no residual orthopedic disability from the injuries he sustained January 31, 1964, (2) that there had been no aggravation of the above mentioned spondylisthesis; (sic) (3) that he presently experienced the same relative ease and comfort he enjoyed prior to the injury, of January, 1964."
Plaintiff was not hospitalized at any time. He testified that he has worn the corset, which was fitted on him by Dr. Macpherson, almost continuously since it was prescribed for him. He stated that he has pain in his back all the time, that it gets worse sometimes, *73 that it still bothers him some, and that "it is a lot better than it was." He has done no work since he first went to Dr. Byrd for treatment, but he testified that if he could get his job back he "might could" do the work and would try.
Dr. Hatchette appears to be the only examining physician who felt that plaintiff's pre-existing spondylolis-thesis was aggravated by the accident. We note, however, that he examined plaintiff on only one occasion, and that was shortly after the accident occurred. The other physicians examined or treated him long after Dr. Hatchette saw him, and thus they were in a better position to determine how he responded to the treatment.
The trial judge concluded that "Mr. Self sustained an acute back sprain in the accident and that he was disabled from returning to his work as a service station attendant for a period of five months." The court awarded plaintiff the sum of $2,000 for his pain, suffering and temporary disability. We think the evidence supports the conclusions reached by the trial court as to the nature and extent of his injury. And, we find no abuse of the much discretion which is vested in the trial court in fixing the award at $2,000.00. Gaspard v. Lemaire, 245 La. 239, 158 So.2d 149; Ballard v. National Indemnity Co. of Omaha, Nebraska, 246 La. 963, 169 So.2d 64.
We also agree with the trial judge that plaintiff is entitled to the sum of $1, 000.00 for loss of wages, that being the wages he would have earned in 20 weeks at $50.00 per week. The evidence also supports the awards of $287.40 for medical expenses and $195.00 for the loss of his car, the latter figure being the difference between the value of the car before the accident and the salvage value afterwards.
For the reasons herein set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.